WILLIAM CAMERON et al., complainants-appellants,

*v.*

THE INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYES AND MOVING PICTURE OPERATORS OF THE UNITED STATES AND CANADA, LOCAL UNION No. 384 OF HUDSON COUNTY, NEW JERSEY, et al., defendants-respondents.

[Argued October 16th, 1934. Decided January 24th, 1935.]

*Mr. Wallace P. Berkowitz* and *Mr. Norbury C. Murray,* for the appellants.

*Mr. Saul Nemser, Mr. John Milton* and *Mr. Samuel S. Stern,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

The primary object of the dismissed bill of complaint was the annulment of the provisions of the constitution and by-laws of the defendant trade union, a voluntary association, and a so-called contract classifying the members thereof as "seniors" and "juniors." Auxiliary injunctive relief was prayed.

The complainants, seven in number, each hold a junior membership. Their insistence is that, in the special circumstances here presented, the contract in question constitutes an "abuse of power," and therefore contravenes sound public

policy, and is void. These are the asserted special circumstances: (1) The local union has "substantially an eighty per cent. monopoly of employment of that trade in" its territorial jurisdiction (the county of Hudson), and are seeking "a complete monopoly;" (2) the senior members *alone* fix the scale of wages and conditions of employment binding upon *all* its members; (3) the seniors control the allotment of employment among its members; (4) the seniors select representatives for all its members, empowered to bargain collectively with employers under the National Industrial Recovery act; (5) the juniors are excluded from voice and vote and participation in the local's management, yet their *per capita* assessment is substantially greater; the juniors are required to pay $454 per annum, as compared with $80 for the seniors; and (6) while classified as "juniors," they are no less competent than the seniors, and, in fact, are not learners, but skilled operators, who receive the same rate of compensation as the seniors. Specifically, complainants maintain that, in the main, these provisions of the constitution, laws and the claimed contract, particularly that granting a preference in jobs to the seniors, bargain away the juniors' "constitutional and inalienable right to earn a living."

These are the circumstances asserted in justification or excuse: The local came into being on March 15th, 1915, under a charter granted by the International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada. It is composed of men pursuing the trade of motion picture machine operators. It is governed by the constitution and by-laws of the international body, so far as applicable, and by a constitution and by-laws of its own adoption. Complainants and thirty-five others were granted a "junior" membership on March 4th, 1930. It is said that the following are the considerations justifying this classification: In 1928, the synchronization of pictorial action and voice and sound became a reality, and this wrought radical changes in that industry. At least two operators were required for the operation of the sound or "talking" picture projector—one sufficed for the silent pic-

ture machine. These men were required to master a new operating technique. The advent of the sound picture, so it is claimed, produced a shortage of skilled projecting machine operators. The local could not supply the demand for adequately trained operators, made by the exhibitors with whom it had "closed-shop" contracts. It then had eighty members skilled only in the operation of the silent picture projector. It became necessary to impart the requisite technical knowledge to them, and to instruct a like number who were wholly unfamiliar with the mechanics of the trade. These latter were given a "permit" to work in the theatres with which the union had a contract, until such time, so the union insists, "as the examining board of the local was convinced that these men were qualified and sufficiently experienced in their trade." These permit-holders acquired practical experience under the tutelage and guidance of the union operators, and, in consideration thereof, paid to the local union ten per cent. of their earnings. On March 4th, 1930, they numbered thirty-five. They worked under the supervision of the union, who was responsible, under its contract with the exhibitor, for damage done to the latter's equipment and machinery. The permit-holders were in no sense members of the union, and consequently had no standing with the parent international body. The result was that when itinerant members of the latter body entered the local's territory, they had a status that entitled them to the jobs held by the permit-holders. This resulted in considerable loss to the latter, and was likewise a source of irritation and annoyance to the exhibitors. So it was concluded that, for the mutual benefit and advantage of all concerned, the permit-holders would be given a union status; hence, the contract in question. The union terms the relationship thus acquired a "limited standing as apprentice," and insists that the primary purpose was to confer upon the permit-holders a status recognized by the international body, which would secure their jobs against the demands of outside members of the latter body. It is vigorously maintained that, in the circumstances, it was only fair and equitable that the union members should reserve a pref-

erence in employment, and to effect this purpose, mainly, the challenged contract came into being. It is said, and with an apparent basis in fact, that the sound pictures were inaugurated with deep misgivings, and that, at the time, it was freely prophesied by men of long experience in the industry that the principle would eventually prove impractical and infeasible as a commercial proposition. It is urged that the sole design of the scheme in question was to safeguard their established position against the consequence of failure of the sound pictures, especially the radical reduction in the number of available places in the event of an enforced return to the silent picture.

To effectuate this design, it was formally resolved by the local union, on January 14th, 1930, "that a Junior Local 384 be created within the jurisdiction of Local 384, I. A. T. S. E. and M. P. M. O.; said Local to be governored [*sic*] by the Senior Local, at all times." On March 4th, 1930, the permit-holders subscribed to the membership contract presented by the union. The membership fee was fixed at $500. A prerequisite to membership was a demonstration of the applicant's capacity. The "senior members," some eighty in number, were listed, and they were expressly "given seniority rights over all other members with reference to employment." There was a specific provision (section 9) that "junior members will at all times be subject to removal from jobs when such jobs are desired by senior members." These were made the prerequisites to admission to senior membership: (1) junior membership; (2) the application must be made "with the consent of the executive board and be vouched for by five senior members," and be accompanied by the "balance on [*sic*] application fee that is in force at the time of his making application into [*sic*] senior body;" (3) the applicant shall be "voted on, by secret ballot, at a regular meeting and receive a two-thirds vote of all senior members present at such meeting;" and (4) compliance with all "constitutional requirements." Prior to December 10th, 1929, the union membership fee was increased from $200 to $1,000. On that day it was increased to $3,000. Complainants insist that this

was not made known to the junior members prior to their admission to the "junior local." As to some of the junior members, there is evidence to the contrary. Provision was also made therein for stated monthly meetings of the "junior members," to be "conducted by the executive board of the senior body." Junior members were thereby required to pay a *"per capita* tax, insurance and all assessments," and dues to the local union of "ten per cent. of salaries earned." Section 11 obligated all members to "abide by the rules of this union, without resort to a court of law, and in the event of expulsion agree to forfeit all property rights in the union."

The contract, as thus outlined, was not induced by fraud, material misrepresentation, mistake, duress or undue influence. There was indisputably such a manifestation of mutual assent by the parties to the terms embodied in the memorandum referred to as to give rise to a contract. The reality of consent of the parties, as it has been termed by a distinguished text writer (*Anson on Contracts (14 Eng. Ed.)* §§ *10, 176*) is not at issue.

But defendants maintain that the provisions of a subsequent revision of the constitution and laws of the local union, adopted in May, 1931, are equally binding upon the junior members. Complainants concede that the revision incorporated into the constitution and by-laws of the local union "the substance of the 'contract,'" but maintain that it "changed and added to it in important particulars." The general insistence is that the revision is void because the "juniors" were not afforded "an opportunity to vote on this revision," or "to be heard thereon," as provided by the 1923 constitution and by-laws. And the following specific provisions are further challenged as an unwarranted insertion of new terms and conditions into the contract evidenced by the constitution and laws in effect when they were admitted to membership and the membership agreement subscribed by them, viz.: (1) "Junior members shall, at no time, be permitted to attend the meetings of the senior body, unless called upon for certain reasons; they shall have no vote on anything pertaining to the business of this local, but may speak in their

own behalf when assembled in their own meeting"—(Revised
By-laws, article 1, section 30); (2) the senior members are
obligated not to disclose to the members of the junior body
"anything transpired [*sic*] in regular or in any other meet-
ings of this union"—(Revised By-laws, article 1, section 21);
(3) although section 8 of the membership contract expressly
provided for monthly meetings of the junior body, the revi-
sion provides—"meetings of the junior body shall be held
whenever called for by the president, at the decision of the
executive board;"—(Revised By-laws, article 1, section 1);
(4) although the membership contract provides that the dues
payable by the juniors shall be ten per cent. of their earnings,
plus per capita tax and insurance, the revision provides—
"The amount of dues to be paid by all members and officers
shall be of such amount as this union may decide upon from
time to time; such decisions shall be decided upon by a two-
thirds ballot box vote of all members voting, and at a regular
meeting"—(Revised By-laws, article 2, section 2); (5) "no
member of this union shall be permitted to give positions to
junior members, * * * unless sanctioned by this union"
—(Revised By-laws, article 1, section 16); and (6) "no
members, senior or junior, shall make or cause to be made
any agreements, verbal or in writing, with owners or mana-
gers of theatres in which they are employed," relating to
"work or salaries coming under the jurisdiction of this
organization"—(Revised By-laws, article 1, section 10). The
revised constitution (article 2, section 6) prescribes the quali-
fications for admission to senior membership, and they are
not substantially different from those contained in the mem-
bership contract, except that subdivision (B) of the constitu-
tion requires service as an "apprentice," while the member-
ship contract provides for service as a "junior member."

Is a contract embodying the terms here outlined contrary
to sound public policy? If this query be answered in the nega-
tive, it will not be necessary to pass upon complainants'
contention that they are not bound by the subsequent revi-
sion of the constitution and laws of the union.

Defendants maintain, *in limine,* that complainants have

not exhausted their remedies within the organization. It is said that they stipulated to submit their "grievances," in the first instance, to a tribunal created by the constitution of the international body, and that they "cannot maintain a civil action against it until the condition precedent of submission has been in legal contemplation complied with." Reliance is placed upon section 11 of the junior membership contract. They point to the provisions of the constitution of the international body (article 10, section 5), which require that appeals and proceedings by a member for the redress of grievances shall be in the following order, viz.: (1) To the local union from its own or its officers' decision; (2) from the decision of the local union to the international president of the alliance; (3) from the decision of the international president to the general executive board; and (4) from the ruling of the general executive board to the alliance in convention assembled, the latter body being the tribunal of "ultimate judgment." Article 9, section 1, provides that "all accusations or charges directed against any affiliated local union or member of this alliance for violation of this constitution and by-laws shall be addressed to the international president."

It is the settled rule that where the question is a social one, involving discipline or the conduct or standing of a member of such an association, he must exhaust his remedy in the tribunal of the organization before he can invoke the aid of the civil courts; and even if property rights are involved, and the rules of the association provide a remedy within that body, and the members have agreed to exhaust that remedy before application to the law courts, the latter will not interfere until that remedy has been exhausted. *Zeliff* v. *Knights of Pythias, 53 N. J. Law 536; Roxbury Lodge* v. *Hocking, 60 N. J. Law 439; Ocean Castle* v. *Smith, 58 N. J. Law 545; affirmed, sub nom. Smith* v. *Ocean Castle, 59 N. J. Law 198; Byrne* v. *Supreme Circle, 74 N. J. Law 258; Grant* v. *Ancient Order of Foresters, 75 N. J. Law 109; Emma* v. *Loggia Fasci Italici No. 16, Sons of Italy, 7 N. J. Mis. R. 387.*

Notwithstanding the contrary insistence of defendants, it is clear that the subject of controversy is a property right. Complainants challenge the asserted contract upon the ground, *inter alia,* that it "bargains away the constitutional and inalienable right to earn a living." This is a property right guaranteed by the fifth and fourteenth amendments of the federal constitution, and by the state constitution. *Cf. Powell* v. *Alabama, 287 U. S. 45; 53 S. Ct. 55; 77 L. Ed. 158; Gitlow* v. *New York, 268 U. S. 652; 45 S. Ct. 625; 69 L. Ed. 1138; Near* v. *Minnesota, 283 U. S. 697; 51 S. Ct. 625; 75 L. Ed. 1357; Allgeyer* v. *Louisiana, 165 U. S. 578; 41 L. Ed. 832.* Passing the question of whether the property right in controversy is cognizable by the tribunals established within the union, we are clear that resort to such tribunals is not required where, as here, the ground of attack is that it is contrary to public policy and therefore void. In such case, the public has an interest which transcends the rights and interests of the union membership, collectively or individually. These organization tribunals were designed to adjust controversies between the unions and its members *inter se* strictly. Here the public is virtually a party, and the provisions in question therefore have no application. If this were merely a controversy between private parties, the complainants would not, even on a clear showing that the object of the contract was illegal, be entitled to relief. It is the established rule that the law will not assist either party to an illegal contract. The parties being in *pari delicto,* it will leave them where it finds them. If the contract be still executory, it will not enforce it, and if already executed it will not restore the *status quo ante. Ellicott* v. *Chamberlain, 38 N. J. Eq. 604; Cone* v. *Russell & Mason, 48 N. J. Eq. 208, 217; Attorney-General* v. *Firemen's Insurance Co., 74 N. J. Eq. 372; Williston on Contracts* § *1630.* But where the contract tends to public injury, different considerations apply. The transaction is then affected with a public interest, and is not *juris privati;* it affects the community at large. Judge Story stated the applicable rule thus: "In cases where the agreements or other transactions are repudiated on account of their being

against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not in equity material. The reason is that the *public interest* requires that relief should be given; and it is given to the *public* through the party." *Story Eq. Jur. (14th ed.) § 421.* Compare *Cone* v. *Russell & Mason, supra.* Mr. Justice Garrison, in *Attorney-General* v. *Firemen's Insurance Co., supra,* held that relief is granted to a party *in pari delicto* through "the fiction of acting for the public." He said: "The fundamental principle recognized by this line of cases is that one who has entered into a contract that contravenes public policy owes to the public the continuous duty of withdrawing from such contract. A duty thus owing to the public is, upon familiar principles, presumed by courts to be performed, and such presumption should be indulged in by the courts whenever necessary to give to the public, acting through its official representative, the same standing that the actual performance of such duty gives to one *in pari delicto* to act for the public."

Is the contract in question valid and enforceable? Trade union membership, like other contractual relationships, is purely voluntary on both sides. Such organizations come into being for purposes mutually agreed upon. The cohesive force is the common interest. Their right to prescribe qualifications for membership, and to make rules and regulations for the transaction of their lawful business, is not open to question. They may impose such requirements for admission and such formalities of election as may be deemed fit and proper; they may restrict membership to the original promoters, or limit the number to be thereafter admitted; the power of such a body to make its membership exclusive is incident to its character. The underlying theory of such combinations is association mutually acceptable, or in accordance with regulations agreed upon. Enforced admission to membership is manifestly contrary to the scheme of such a society. No person has an abstract or absolute right to such membership. *Mayer* v. *Journeymen Stonecutters' Association, 47 N. J. Eq. 519.*

But the contract must not be repugnant to public policy.

Is this contract in that category? What considerations require the rejection of a contract as violative of sound governmental policy? The personal liberty and right of property guaranteed by the fifth and fourteenth amendments of the federal constitution embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor. *Adair* v. *United States, 208 U. S. 161; 28 S. Ct. 277; 52 L. Ed. 436; Coppage* v. *Kansas, 236 U. S. 1, 14; 35 S. Ct. 240; 59 L. Ed. 441; Hitchman Coal and Coke Co.* v. *Mitchell, 245 U. S. 229; 38 S. Ct. 65; 62 L. Ed. 260.* This right, fundamental in the common law, is also, as we shall see, secured by the state constitution. The question remains, can the union, as a *sine qua non* of membership, require a surrender or substantial modification or impairment of this individual constitutional right of freedom of contract in respect of the disposal of one's labor? Is this an unalienable right? It has been so termed. Article 1, paragraph 1, of the state constitution declares that "all men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness." This court, in an opinion written by Mr. Justice Pitney, said of this: "The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellowmen, saving such as may result from the exercise of equal or superior rights on their part—such, for instance, as the right of fair competition in the like field of human effort—and saving, of course, such other hindrance or obstruction as may be legally excused or justified. This right is declared by our constitution to be unalienable. (Article 1, paragraph 1.) As a part of the right of acquiring property there resides in every man the right of making contracts for the purchase and sale of property, and contracts for personal services, which amount to the purchase and sale of labor. It makes little

difference whether the right that underlies contracts of the latter sort is called a personal right or a property right. It seems to us impossible to draw a distinction between a right of property and a right of acquiring property that will make a disturbance of the latter right any less actionable than a disturbance of the former." *Brennan* v. *United Hatters of North America, &c., 73 N. J. Law 729, 742.* "There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more or less than the sacred right of labor." *Conners* v. *Connolly, 86 Conn. 641; Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, 92 N. J. Eq. 131.* The right of a workman to the "free use of his hands" has been described as one "of which the legislature cannot deprive him, one which the law of no trades union can take from him, and one which it is the bounden duty of the courts to protect." *Erdman* v. *Mitchell, 207 Pa. 79; 56 Atl. Rep. 327.* "A man may not barter away his life, or his freedom, or his substantial rights." *Home Insurance Co.* v. *Morse, 20 Wall. 445; 22 L. Ed. 365.*

But however this may be, it is clear that such a contract is void, if repugnant to sound public policy. The enjoyment of these constitutional rights is subject always to the fundamental condition that no contract, whatever its subject-matter, can be sustained, which the law, upon reasonable grounds, forbids as inconsistent with the public interest, or as hurtful to the public order, or as detrimental to the common good. *Adair* v. *United States, supra; Coppage* v. *Kansas, supra; Hitchman Coal and Coke Co.* v. *Mitchell, supra.* They are at all times subject to the exercise of the police power. As declared by Mr. Justice Harlan in an earlier case, the individual liberty secured by the federal constitution "does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself

would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state * * *.'" *Jacobson* v. *Massachusetts, 197 U. S. 11; 25 S. Ct. 358; 49 L. Ed. 643. E converso,* if a contractual surrender or modification of such a fundamental right is contrary to the public interest, it is ineffective. The same public policy which imposes restraint upon individual liberty and freedom of contract, when required for the common good and general welfare embraced within the police function of government, ordains that such individual rights shall not be surrendered or impaired, if thereby the public interest will be injuriously affected. There has been, in modern times, a noticeable quickening of social consciousness—a growing appreciation of public needs, and the relation of individual right to public security. The *desideratum* is social security; and its attainment of necessity requires the finding of a basis for rational compromise between individual rights and the public welfare. "The interrelation of the activities of our people and the complexity of our economic interests" require the use of reasonable means to "safeguard the economic structure upon which the good of all depends." The fundamental interests of the state must be secured; the common interest is of paramount concern. *Home Building and Loan Association* v. *Blaisdell, 290 U. S. 398; 54 S. Ct. 231; 78 L. Ed. 413.*

The contract at issue does not meet this test of validity. The public policy that sanctions trade unions is now well defined. Whatever may have been the early view in this state, the law now recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available, for the pursuit of their common interests, the strength, influence and power that come from such associa-

tion. The enactment of chapter 28 of the laws of 1883 (*P. L. 1883 p. 36; Comp. Stat. p. 3051*) inaugurated a definite change of state policy in respect of such combinations. This measure provides that it shall not be unlawful for two or more persons to unite, combine or bind themselves "to persuade, advise or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any person, persons or corporation." And in 1926, the legislature provided that no injunction shall issue "in any case involving or growing out of a dispute concerning terms or conditions of employment" against peaceable picketing, or the employment of means and methods, in the promotion of a strike, that do not constitute intimidation or obstruction. *P. L. 1926 p. 348.* These statutes were designed to sanction combinations of workingmen moved by a purpose to secure a higher wage rate for their services, or a betterment of working conditions, or the legitimate advancement of the general welfare of the members of the combine. In the furtherance of the common objective, the use of peaceable and lawful means only is permissible. The legislative purpose was indisputably to impart legality to organizations set up for the benefit of the members as a class—to secure a fair measure of equality between the employer and the employes in the lawful economic struggle between them as to the division of the joint product of labor and capital. It thereby accorded recognition to the now generally accepted view that such combinations are conducive to the well-being of society, and a necessary part of the social structure. The amelioration of the condition of labor is now regarded by enlightened government as a duty of paramount importance. The economic independence and security and contentment of labor are essential for the public order and welfare. *Bayonne Textile Corp.* v. *American Federation of Silk Workers, 116 N. J. Eq. 146; Mayer* v. *Journeymen Stonecutters' Association, supra; New Jersey Painting Co.* v. *Local No. 26 Brotherhood of Painters, &c., 96 N. J. Eq. 632; Bayer* v. *Brotherhood of Painters, &c., 108 N. J. Eq. 257; Gompers* v. *Buck's Stove and Range Co., 221 U. S. 418;*

*31 S. Ct. 492; 55 L. Ed. 797; American Steel Foundry* v. *Tri-City C. T. Council, 257 U. S. 184; 42 S. Ct. 72; 66 L. Ed. 189; Thomas* v. *Cincinnati, 62 Fed. Rep. 803; Meier* v. *Speer, 96 Ark. 618; 132 S. W. Rep. 988; Kemp* v. *Division No. 241, &c., 255 Ill. 213; 99 N. E. Rep. 389; Auburn Draying Co.* v. *Wardell, 227 N. Y. 1; 124 N. E. Rep. 97.*

But it is a corollary of the foregoing that the power thereby conferred shall not be misused. It shall not be employed to the detriment of society; it shall not be used as a means of oppression and injustice in respect of its members, or to deprive any of them, in the form of a contractual surrender, or otherwise, of their fundamental rights when the public interest will not be thereby served. There can be no arbitrary or capricious discrimination between the members of the union in respect of equality of opportunity to work. The arbitrary use of the power derived from such combination to advance the interests of some of the members, at the expense of the remainder, would thwart the fundamental purpose of such union, and defeat public policy. Public policy is the public interest. It transcends individual rights. It is patent that the senior members are striving to obtain a monopoly of the labor market in this particular trade, and to deprive the junior member of an equal opportunity to obtain employment and earn a livelihood for himself and his family. In fact, monopoly has been practically accomplished; absolute and complete dominion of the labor market is within reach. The public evils flowing from this policy are apparent. It tends to economic servitude—the impoverishment of the one class, the "juniors" for the enrichment of the other—and is manifestly opposed to the public interest. The inevitable results are the loss of the services of useful members of society, and unrest, discontent and disaffection among the workers so restrained—a condition that is unquestionably inimical to the public welfare. This is an unfair exercise of the power springing from the combination. It is an arbitrary and unreasonable restraint of trade, and therefore obnoxious to the law. A classification so based is clearly contrary to the public interest.

The constitutional rights of liberty and property may be limited only to the extent necessary to subserve the public interest. The union cannot, in the service of its interest, deprive a non-member of his constitutional right of liberty and property. The statutes giving sanction to such unions were designed "to secure most favorable conditions for labor of their members," and are "not a warrant for making war upon the non-union man, or for illegal interference with his rights and privileges. * * * There are in such a combination against an employe the suggestions of coercion, attempted monopoly, deprivation of livelihood, and remoteness of the legal purpose of the union to better its members' condition." *American Steel Foundry* v. *Tri-City C. T. Council, supra.* And this limitation is likewise imposed upon the combination in dealing with its members. It is restricted to the advancement of the common interest through peaceable and lawful means, provided the public interest is not thereby injuriously affected. The function of a trade union is to increase the individual bargaining power by collective action, and thus to promote the common interest of its members. If, in the pursuit of this objective, through peaceable means and methods that are otherwise deemed to be lawful, injury incidentally results to another, it is *damnum absque injuria.* But the power conferred upon such an organization must be directed to the advancement of the common interest and general welfare of its members. Such is its extent and limit.

The classification in question is an unreasonable restraint of the junior members' constitutional rights. It is an arbitrary interference with the liberty of contract, and, therefore, a palpable abuse of power. There is a lack of reasonableness to accomplish a lawful end; it is merely an arbitrary and capricious interference with the individual liberty of contract to benefit those who imposed the restraint. Certain rights, as of life, and personal liberty in the restricted sense, are clearly so absolute as to be unalienable; they cannot be bargained away. But it is clear that, in any event, the surrender of a fundamental right is not within the power of an individual, if the public interest would thereby be prejudiced.

The liberty of contract may unquestionably be restrained, if public policy demands it. In such circumstances, the constitution does not forbid the imposition of the restraint. The test is whether the parties have stipulated for something inhibited by the law, or held to be inimical to or inconsistent with the public welfare. The safeguarding and protection of the individual right to labor, and the securing of an adequate return for the laborer's service, are the primary purposes of the combination. "The conservation of the chief asset of the laboring man, namely, his labor, through combination with his fellows and by their organized efforts is to be commended rather than condemned. For in that way his well-being may be best promoted and the interest of society thereby advanced. As observed by Judge Taft, in *Thomas* v. *Cincinnati, 62 Fed. Rep. 803, 817:* 'It is of benefit to them and the public, that laborers should unite. They have labor to sell. If they stand together they are often able, all of them, to command better prices for their labor, than when dealing singly with rich employers, because the necessities of the single employe may compel him to accept any terms offered.'" *Meier* v. *Speer, supra.* The underlying policy of the Clayton act is that labor unions serve the public interest when instituted for mutual help and co-operation. *American Steel Foundry* v. *Tri-City C. T. Council, supra.*

There is obviously no merit in the claim that the classification of the juniors as "apprentices" is reasonable under the circumstances. They are not learners in any sense of the term. They are now skilled mechanics. Moreover, no test of capacity is laid down, either in the form of a given period of satisfactory service or a specific demonstration, by examination or otherwise, of the requisite skill, as a condition to admission into the senior body. And the increase of the admission fee from $200 to $3,000 bears no reasonable relation to the technical skill of the applicant. It is manifest that the sole purpose of the classification is to create a monopoly in favor of the seniors. While it is suggested that the original purpose was to protect the seniors in the event that the sound pictures should prove impracticable, the commercial prac-

ticability of synchronized sound and picture records has long since been established. In the face of this, the effort to continue this system makes plain the motive.

Assuming, without deciding, that such combinations may, under given conditions, create seniority privileges that are reasonable, and therefore lawful, such is clearly not the case here. The juniors, although assessed at a rate greatly in excess of that imposed upon the seniors, are denied the right of participation in the formulation of the policies of the union, and in the management of its business. The power to determine the wage scale and acceptable working conditions is vested exclusively in the seniors. An exclusive control in the apportionment of work is likewise committed to the seniors. The bargaining power is lodged in the latter group. The juniors are enjoined from making agreements with their employers relating to "work or salaries." And, as pointed out, the seniors may arbitrarily bar the juniors from membership in the union proper, and from all participation therein. In short, the contract constitutes an irrevocable transfer to the seniors of the juniors' bargaining power and fundamental right of contract, while they remain members of the union. Their status is not even that of nominal members of the combination. They are under the absolute control of this body, but are in no sense part of it. Thus the liberty of contract is unreasonably restrained; the design is not to advance the public welfare, but the individual interests of the senior members solely. It is a perversion, an embezzlement, of power.

It is true that the juniors were not obliged to accept the status thus accorded them by the union, but it is equally true that membership in such a body, whatever its form, cannot be conditioned upon the surrender of the member's individual constitutional rights when that would not subserve the public interest. And there is, unquestionably, the suggestion of coercion here. Non-membership would impose a penalty, however lawful, that the juniors were seeking to avoid.

Under these circumstances, equitable interposition is not only justified but demanded by the public interest. As was

said by Mr. Justice Lamar, in *Gompers* v. *Buck's Stove and Range Co., supra,* "but the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the constitution; or by standing on such rights, and appealing to the preventive powers of a court of equity. When such appeal is made, it is the duty of government to protect the one against the many, as well as the many against the one."

And it does not matter that, at the moment, the junior members have not, in fact, suffered an impairment of earning power by reason of the enforcement of this contract. If it tends to the public injury, it should be annulled without regard to whether public injury had in fact resulted. *Attorney-General* v. *Firemen's Insurance Co., supra.* Such is clearly its tendency.

Decree reversed, and cause remanded for further proceedings in conformity with this opinion.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, KAYS, HETFIELD, DEAR, WELLS, JJ.   12.