W. L. BRYAN et al., Complainants-Appellees, v. INTERNATIONAL ALLIANCE, etc., et al., Defendants-Appellants.—306 S. W. (2d) 64.

Eastern Section. July 9, 1957.

Petition for Certiorari Denied by Supreme Court October 4, 1957.

King & Fuston, Chattanooga, for appellants.

Cunningham, Crutchfield & Summitt, Harold Humphreys, Chattanooga, for appellees.

HICKERSON, J. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, herein called parent union, is the International parent union with jurisdiction in the United States and Canada. Affiliated with the parent union are many local unions scattered throughout the United States and Canada. Local 259 has jurisdiction in the Chattanooga area. The local unions, to which reference is made in this opinion, are all affiliated with the parent union.

Frequently, members of one local union will move into an area outside their own local union and make application to the local of their new residence to work under, within, and through the local to which they moved. Foreign locals are called "Sister Locals." Members of many such sister locals moved into the Chattanooga area over which Local 259 had jurisdiction and made application to work under Local 259. Some of these applicants from sister locals came to Chattanooga upon the request of Local 259 because Local 259 did not have enough qualified members to fill the jobs in the Chattanooga area. Possibly some of the applicants came to Chattanooga upon their own volition without an invita-

tion from Local 259. Reference will be made to these applicants as foreign members.

A group of these foreign members brought the suit on trial against the parent union, Local 259, certain members and officers of Local 259, individually and as officers of Local 259, and the Hamilton National Bank. Complainants alleged they were being mistreated by Local 259; and, among other relief sought, prayed:

"That defendants be required to enroll the complainants names on the membership of the defendant Local, and extend to the complainants all rights and privileges, as well as obligations, of the said defendant Local."

Defendants denied that complainants were entitled to any relief. The Chancellor sustained the bill and entered a decree which, in effect, required Local 259 to admit these foreign members (complainants) to full membership in Local 259. Of that decree defendants complain in this Court through assignments of error and supporting brief and oral argument at the Bar of this Court.

Complainants have assigned one error in this Court:

"The Court erred in refusing to require the defendants to enroll the complainants' names on the membership of the defendant Local and extend to the complainants all rights and privileges, as well as obligations, of the said defendant Local. The Court, having found that the defendant Local was a closed union and that a closed shop contract existed between the defendant Local and the motion picture theatre owners, should have required the defendants to enroll the complainants' names on the member-

ship of the defendant Local and extend to the complianants all rights and privileges, as well as obligations, of the said defendant Local.''

There are two determinative questions before this Court:

1. Could these foreign members successfully invoke the aid of the Court without first exhausting the remedies provided for them within the framework of the parent union and the local unions?

2. If the Court were authorized, under the factual situation presented, to hear and adjudicate the controversy between the parties, are the foreign members (complainants) entitled to the relief for which they pray on the merits of the case?

These two questions will be considered and determined in the order stated.

(1) The parent union is controlled and operated by a Constitution and By-laws. Any reference herein to the Constitution and By-laws will be a reference to this Constitution and By-laws of the parent union. All local unions affiliated with the parent union are, also, subject to the Constitution and By-laws of the parent union. Members of the locals are subject to the Constitution and By-laws. Local 259 and its members are subject to the Constitution and By-laws. The foreign members are likewise subject to the Constitution and By-laws.

The management and control of the locals lie in the locals, subject to the Constitution and By-laws of the parent union; that is, each local is granted the authority and power to exercise full and complete control over its own affairs subject to the restrictions stated.

Article Sixteen of the Constitution and By-laws provides in detail for the discipline of members by written charges, trial thereon, and judgment.

Article Seventeen provides for appeal, as follows:

"Any member (after exhausting the appeal procedure provided within his local union) or any local union aggrieved by the decision, rule, regulation, order or mandate of any officer, body or tribunal of this Alliance may appeal his or its case in the following order: (1) From the decision, rule, regulation, order or mandate of the local union to the International President of this Alliance; (2) from the decision, rule, regulation, order or mandate of the International President to the General Executive Board; (3) from the decision, rule, regulation, order or mandate of the General Executive Board to the Alliance in Convention assembled, and the latter body shall be the tribunal of ultimate judgment."

It is admitted by complainants that they did not follow the procedure and exhaust their remedy under the Constitution and By-laws of the parent union and Local 259. As an excuse, or reason, for failure so to do, complainants alleged that it would have been useless and futile for them to have prosecuted their complaints, or charges, under the methods provided by the Constitution and By-laws.

The general rule is stated in 31 Am. Jur., 864, Labor, Section 67:

"Conditions Precedent. — Following the general rule applicable to associations generally, in case of social questions involving the discipline or the con-

duct or standing of a member of a trade union, he must exhaust his remedy before the tribunals of the organization before invoking the aid of the civil courts. Even in cases involving property rights, when the rights of a body provide a remedy which the members have agreed to exhaust before application to the courts, they will not interfere until the exhaustion of that remedy.''

This general rule is followed in the State of Tennessee. Wilson v. Miller, 194 Tenn. 390, 250 S. W. (2d) 575; Haynes v. United Chemical Workers, 190 Tenn. 165, 228 S. W. (2d) 101.

In Cameron v. International Alliance Theatrical Stage Employees, 118 N. J. Eq. 11, 176 A. 692, 696, 97 A. L. R. 594, the general principle is stated that where, ''the rules of the association provide a remedy within that body, and the members have agreed to exhaust that remedy before application to the law courts, the latter will not interfere until that remedy has been exhausted. State (Zeliff, Prosecutor) v. Grand Lodge, K. P., 53 N. J. L. 536, 22 A. 63; Roxbury Lodge, No. 184, I. O. O. F. v. Hocking, 60 N. J. L. 439, 38 A. 693, 64 Am. St. Rep. 596; Ocean Castle No. 11, Knights of the Golden Eagle v. Smith, 58 N. J. L. 545, 33 A. 849, affirmed sub nom. Smith v. Ocean Castle No. 11, Knights of the Golden Eagle, 59 N. J. L. 198, 35 A. 917; Byrne v. Supreme Circle, B. U., 74 N. J. L. 258, 65 A. 839; Grant v. Ancient Order of Foresters, 75 N. J. L. 109, 66 A. 902; Emma v. Loggia Fasci Italici No. 16, Order Sons of Italy, 145 A. 630, 7 N. J. Misc. 387.''

Without following the procedure prescribed by the union, complainants, or some of them, talked to officials

of the parent union and told these officials, informally of their grievances. These officials told complainants there was no merit in their charges against Local 259 and its members. Letters were written, informally, with no result. The parent union refused to give complainants a charter identical with the charter of Local 259. This new local would have been operated in opposition to Local 259 and under the same parent union. Of course, the charter was properly refused.

Wherefore, the contention of complainants that any effort on their part to redress their wrongs under their contract with the union and the Constitution and By-laws adds up to this: some union officials, informally, told the foreign members there was no merit in their charges against Local 259 and its members.

■ We cannot hold that the foreign members were justified in their resort to the Courts without first prosecuting their complaints and charges against Local 259 and its members within the framework of the union. The exception to the general rule requires complainants to show that the proceeding by them under the union rules would have been useless and futile. ''Useless and futile,'' as that term is used in the decisions, does not mean that complainants can resort to the Courts because all the union officials and members told them, informally, that there was no merit in their contentions and charges against Local 259. If we were to adopt that rule, disgruntled foreign members could demand any status they might choose of the local and parent union, without regard to the merit or lack of it in their contentions, then resort to the Courts without proceeding within the framework of the unions on the ground that all union

members and officials with whom they discussed their problems told them there was no merit in their claims.

We refuse to hold that the officials and official bodies to which complainants could have presented their claims originally and on appeal under the Constitution and By-laws would have been arbitrary, unfair, and dishonest in their consideration of complainants' grievances and charges. Article Seventeen, Section 1 gives the names of these various officials and tribunals before whom complainants could have prosecuted their claims within the framework of the Constitution and By-laws. For emphasis, we report the provisions of Article Seventeen, Section 1 of the Constitution and By-laws relating to such trials and the order of appeals:

"Any member (after exhausting the appeal procedure provided within his local union) or any local union aggrieved by the decision, rule, regulation, order or mandate of any officer, body or tribunal of this Alliance may appeal his or its case in the following order: (1) From the decision, rule, regulation, order or mandate of the local union to the International President of this Alliance; (2) from the decision, rule, regulation, order or mandate of the International President to the General Executive Board; (3) from the decision, rule, regulation, order or mandate of the General Executive Board to this Alliance in Convention assembled, and the latter body shall be the tribunal of ultimate judgment."

Now these foreign members had agreed to abide by all the rules and regulations of the parent union and local

union as a condition precedent to membership. They signed a pledge which stated:

"I, the undersigned, as a condition of my membership in the International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada, do solemnly pledge myself to accept and abide by the provisions of this Constitution and By-Laws, as now in force and as hereafter legally amended, and hereby express my consent to be governed thereby in the conduct of my trade and in my relationship with the Alliance."

Furthermore, Article Seventeen, Section 7, provides:

"Section 7. Exhausting Internal Remedies.

"The members of this Alliance further consent to be disciplined in the manner provided by this Constitution and By-Laws, *and under no circumstances to resort to the civil courts until all the remedies therein provided shall have been exhausted.*" (Empahsis added.)

The very purpose of this contract, evidenced by the Constitution and By-laws, was to resolve controversies and difficulties within the unions so as to avoid trouble, time, effort, expense, and unfavorable publicity incident to a trial in the courts. We will not relieve complainants from the obligations of this contract which they solemnly and willingly entered into. The bill should have been dismissed because complainants did not exhaust their remedies under the Constitution and By-laws before filing their bill.

(2) If we assume that complainants had a right to have their grievances decided by the Courts, were complainants entitled to a decree in their favor on the merits?

Article Twenty-one of the Constitution and By-laws provides the method of becoming a member of the parent union through membership in the locals. Under the subtitle "Balloting on Applicants," Article Twenty-one, Section 4, provides:

"Applicants who have complied with the preceding Sections of this Article and who are, thereunder, eligible for membership, shall be proposed for admission at a regular meeting of the local union.

"Such applicants shall not be present when their names are proposed for membership and open discussion shall be permitted. The members of the local union shall then proceed to ballot upon the applicants and the members shall vote to reject or accept the names proposed. The laws of the local union shall govern the number of votes necessary for election to membership but in no event shall a local union be permitted to require more than a two-thirds majority vote of the members present at any regular meeting to admit an applicant to membership."

Article Nineteen, among other things, provides the method of transferring membership from one local to another local. Section 18 of Article Nineteen states:

"Local unions shall be obliged upon request to issue any member in good standing a transfer card

to enable him to gain admission to another affiliated local union.

"Any local union wrongfully refusing to issue a transfer card upon demand shall be subject to the penalty of charter revocation.

"After obtaining a transfer card from his local union the member desiring to transfer shall, within 30 days after its issuance, deposit the card with the local union with which he wishes to become affiliated, which local union shall within sixty days after issuance, either accept or reject such applicant.

\* \* \* \* \* \*

*"If the local union to which the member desires to transfer rejects his application, it shall return to him his transfer card.* The member shall, within ninety days of its date of issue, return the transfer card to the local union which issued it." (Emphasis added.)

Article Nineteen, Section 15 provides:

"The affiliated local unions of this Alliance shall execute written contracts with local managers and other employers regulating conditions of employment of all members within their jurisdiction."

Article Nineteen, Section 16, provides:

"Section 16. Employment of Members.

*"Affiliated locals are required to insist that all positions within their jurisdiction be filled by their own members.* In the event of the local membership being unable to care for all vacancies, preference

must be given to members of sister locals affiiliated with this Alliance. Not until the available members of the resident and out-of-town locals have been employed shall the engagement of non-members be permitted.'' (Emphasis added.)

There is no serious contention on the part of the foreign members that the Constitution and By-laws are an illegal contract. Some question is made that Local 259 did not provide a written contract with the employers as provided by the Constitution and By-laws. There is no merit in this contention. Defendants explained this departure from the Constitution and By-laws. Such contract could not be legally entered into in this State under T. C. A. sec. 50-208 and T. C. A. sec. 50-209.

T. C. A. sec. 50-208 and T. C. A. sec. 50-209 are directed to employers and do not apply to a suit against the union or its members. Dukes v. Brotherhood of Painters, etc., Local Union No. 437, 191 Tenn. 495, 235 S. W. (2d) 7, 26 A. L. R. (2d) 1223.

The Constitution and By-laws make the local union the exclusive judge of its membership. It may accept or reject the application of any person for membership in the discretion of the local. If this were not true members of sister locals could move within the jurisdiction of Local 259 and have several hundred members for only thirty-three jobs. Thus, the availability of work for the members of the union would be destroyed for all practical purposes.

To guard against this contingency, Local 259 would not accept foreign members as full members of Local 259. This practice seems to have been definitely approved by the foreign members and the local members

and the parent union under Article Nineteen, Section 16 of the Constitution and By-laws. The foreign members were, however, accorded the privilege of working under Local 259 and these foreign members received the same wages and hours and working conditions which regular full members of Local 259 enjoyed. Not being members of Local 259, these foreign members were not allowed to vote in the meetings of Local 259. The foreign members worked in this manner for many years without complaint. During the first years there were jobs for local and foreign members.

In recent years the jobs have become scarce, and the foreign members were afraid they would be put out of work. The record does not show that they made any application to become members of Local 259 when they first came to the Chattanooga area to work, as provided in the Constitution and By-laws. Article Nineteen, Section 18.

The foreign members did make application to join Local 259 before the present suit was filed, and their applications were rejected. To further secure steady employment for its own members, Local 259 limited its membership to twenty-five.

There were thirty-three jobs in the Chattanooga area. Since the Constitution and By-laws provide that locals must give their own members first priority of jobs and then give the foreign members of sister locals, who were working under the local of which they were not members, second priority, Constitution and By-laws Article Nineteen, Section 16; there were eight jobs for the foreign members after the twenty-five members of Local 259 were employed.

To grant further security to themselves and their families, Local 259 passed the Sons' Resolution, as follows:

"To: The Officers and Members of Local 259, I. A. T. S. E. & M. P. M. O. of U. S. & C.

## "Greetings

"Whereas: Changing conditions within our craft and the advancing age of the members of Local 259, I. A. T. S. E. & M. P. M. O., presents a problem in connection with the future destiny of our Local organization, and

"Whereas: A majority of the members have sons that at the proper time might desire to become members of the craft, therefore be it,

"Resolved: That Local 259, I. A. T. S. E. & M. P. M. O. of U. S. & C., does hereby establish the policy of giving preference (in the matter of future applicants) to the sons of members of Local 259, on the following terms and conditions.

"Only legitimate sons or those under legal adoption for a period of at least fifteen years are eligible. That the applicant will have reached the age of nineteen and have served a training period of at least six months. At the completion of the training period, the applicant will be required to pass an examination with a mark of at least 75%. In the event the applicant fails to pass the examination with the required grade he will be permitted to take subsequent examinations each three months, until a total of three examinations have been taken, after which

he will be barred from taking further examinations for a period of one year.

"Three sets of examination questions and answers, of equal value are to be approved by the 'Local, and at the time of examination the applicant will draw one set of said questions, and the same will be those he is required to pass.

"At the expiration of the training period and upon the successful passing of the examination the applicant will become a member of Local 259, I. A. T. S. E. & M. P. M. O. under probation for one year, at the expiration of which the Local membership will take a final vote on admission of the applicant to membership, subject to the following restrictions (to which the applicant is required to subscribe at the beginning of their probation period) that the present membership of Local 259, namely: T. D. Ayers, O. A. Ayers, J. B. Blanton, W. C. Belcher, G. E. Curle, Edw. Healy, F. F. Hamill, W. R. Hipp, D. E. Harrison, R. H. Johnson, A. C. Kamin, J. B. Lowry, J. J. McDowell, L. L. McCurdy, P. J. Nelligan, Geo. D. Overend, C. W. Spann, J. K. Smith, Leo Vick, and W. W. Williams, will have Seniority Rights over any and all New members until such time as the present membership shall drop below twenty. At which time the new members will be admitted to the Seniority Class in the order in which they were first admitted to membership. New members are to have Voice but no Vote in the affairs of the organization until such time as they have been admitted to the Senior Class. An initiation fee of $150.00 is to be charged all applicants admitted

under the terms of this resolution, and the same will be considered as a forfeit if the applicant is not accepted at the expiration of their probation period, the balance of $100.00 is due and payable upon final acceptance into the Local at the end of the probation period.

"Resolved: That upon adoption of this resolution the provisions herein contained cannot be altered or set aside except by a three-fourth majority vote of all members in good standing at a regular meeting, and after due notice to the membership.

"Any previous or existing Local By-Laws in conflict with this resolution are hereby amended or repealed as may be necessary for the proper administration of this resolution.

"The Committee."

In DeMille v. American Federation of Radio Artists, 31 Cal. (2d) 139, 187 P. (2d) 769, 774, 175 A. L. R. 382, the Court said:

"The articles of agreement, Constitution and by-laws of AFRA both National and Local constitute a contract with the members, and are binding on the plaintiff. Grand Grove, etc., v. Garibaldi Grove, 130 Cal. 116, 120, 62 P. 486, 80 Am. St. Rep. 80; Lawson v. Hewell, 118 Cal. 613, 621, 50 P. 763, 49 L. R. A. 400; Harris v. Geier, 112 N. J. Eq. 99, 104, 105, 164 A. 50; O'Keefe v. Local 463 of United Ass'n of Plumbers, supra, 277 N. Y. 300, 304, 14 N. E. (2d) 77, 117 A. L. R. 817; Cameron v. International Alliance, etc., 118 N. J. Eq. 11, 176 A. 692, 97 A. L. R. 594; Amalgamated Clothing Workers of America v.

Kiser, 174 Va. 229, 6 S. E. (2d) 562, 564, 125 A. L. R. 1251. As that contract may prescribe the terms upon which membership in a union may be gained, so may it define the conditions which will entail its loss. Polin v. Kaplan, 257 N. Y. 277, 177 N. E. 833.''

The same rule is stated in 31 Am. Jur., 861, Labor, Section 58:

"Like other associations, trade unions may prescribe qualifications for membership. They may impose such requirements for admission and such formalities of election as may be deemed fit and proper. Moreover, they may restrict membership to the original promoters, or limit the number to be thereafter admitted. No person has an abstract or absolute right to membership."

In Cameron v. International Alliance of Theatrical Stage Employees, 118 N. J. Eq. 11, 176 A. 692, 697, 97 A. L. R. 594, the Court was dealing with a local which had a "closed shop" contract with the employer. The Court said, in part:

"The rules of the association provide a remedy within that body, and the members have agreed to exhaust that remedy before application to the law courts, the latter will not interfere until that remedy has been exhausted. State (Zeliff, Prosecutor) v. Grant Lodge, K. P., 53 N. J. L. 536, 22 A. 63; Roxbury Lodge, No. 184, I. O. O. F. v. Hocking, 60 N. J. L. 439, 38 A. 693, 64 Am. St. Rep. 596; Ocean Castle No. 11, Knights of the Golden Eagle v. Smith, 58 N. J. L. 545, 33 A. 849 affirmed, sub nom. Smith v. Ocean Castle No. 11, Knights of the Golden Eagle,

59 N. J. L. 198, 35 A. 917; Byrne v. Supreme Circle, B. U., 74 N. J. L. 258, 65 A. 839; Grant v. Ancient Order of Foresters, 75 N. J. L. 109, 66 A. 902; Emma v. Loggia Fasci Italici, O. S. I., 145 A. 630, 7 N. J. Misc. 387.

\*    \*    \*    \*    \*    \*

"Trade union membership, like other contractual relationships, is purely voluntary on both sides. Such organizations come into being for purposes mutually agreed upon. The cohesive force is the common interest. Their right to prescribe qualifications for membership, and to make rules and regulations for the transaction of their lawful business is not open to question. They may impose such requirements for admission and such formalities of election as may be deemed fit and proper; they may restrict membership to the original promoters, or limit the number to be thereafter admitted; the power of such a body to make its membership exclusive is incident to its character. The underlying theory of such combinations is association mutually acceptable, or in accordance with regulations agreed upon. Enforced admission to membership is manifestly contrary to the scheme of such a society. No person has an abstract or absolute right to such membership. Mayer v. Journeymen Stone-Cutters' Ass'n, 47 N. J. Eq. 519, 20 A. 492.

"But the contract must not be repugnant to public policy. Is this contract in that category? What considerations require the rejection of a contract as violative of sound governmental policy? The personal liberty and right of property guaranteed by

the Fifth Amendment of the Federal Constitution embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor. Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; Coppage v. Kansas, 236 U. S. 1, 14, 35 S. Ct. 240, 50 L. Ed. 441, [446] L.R.A.1915C, 960; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918 C, 497, Ann. Cas. 1918 B, 461.''

The Constitution and By-laws is a valid contract which is binding upon the parent-union, the local unions, and members of the local unions who by virtue of their membership in their local unions are members of the parent union. Under the applicable law Local 259 had the right to select its members under any plan which was not contrary to the Constitution and By-laws, the laws of the land, or public policy. Selecting its members as it did was not contrary to the Constitution and By-laws; nor was this method of selection contrary to the laws of this State.

To maintain their bill, complainants must prove that Local 259 was a closed union and the contracts with employers were closed-shop contracts. Whether Local 259 was a closed union and whether the agreements with the employers were closed-shop contracts are questions of fact. If complainants failed to prove either fact they cannot maintain their suit; for the operations of Local 259 would not be against public policy of the State if Local 259 operated as an open union, or if the agreements with the employers were not closed-shop agreements.

■ If the facts establish a closed-shop agreement and a closed union, complainants could maintain their suit under the theory that defendants had created in Local 259 a monopoly of opportunities for employment in industry contrary to Section 1 of the Fourteenth Amendment to the Constitution of the United States and contrary to Section 8, Article 1 of the Constitution of Tennessee. These State and Federal constitutional provisions protect the life, liberty and property of all persons in an equal manner. The right to work or to contract in regard to this right is a property right which is protected by these constitutional provisions. Cameron v. International Alliance of Theatrical Stage Employees, 118 N. J. Eq. 11, 176 A. 692, 97 A. L. R. 594. This rule, however, has two edges and cuts each way; that is, in favor of persons seeking employment and membership in Local 259 and in favor of the right of Local 259 and its members to contract in regard to work.

■ The Chancellor held Local 259 was a closed union and its contracts with the employers were closed-shop contracts in these words:

"This Court is definitely of the opinion that defendant Local 259 is not only a closed Union, but that it is also operating for all practical purposes as a closed shop in violation of the Tennessee Right-to-work or Anti-Closed Shop Law. This case clearly evidences the obvious evils of a coexisting closed Union and a closed shop. Let us consider some of the results of the defendant Local having the right to act as the collective bargaining agency representing the complainants."

A review of the evidence is not necessary. We here state the ultimate facts. There is *no evidence* to support the foregoing conclusions of fact by the Chancellor. To the contrary, all the evidence pointedly and directly shows that Local 259 was not a closed union and that its contracts or agreements with the employers were not closed-shop agreements. It is true that the employers called upon the union to furnish men for the jobs when they needed them, and the jobs were filled through the agency of the union. However, complainants, who were not members of Local 259, were regularly employed by the employers. The only employer who testified stated emphatically that he did not operate under a closed-shop agreement; but, to the contrary, he testified he hired and fired whom he pleased. There is no proof that any non-union men ever applied to the employers for work. If non-union men had made application to the employers for work, a refusal to employ them by the employers because they were non-union men would have violated the laws of this State. T. C. A. sec. 50-208 and T. C. A. sec. 50-209.

There is no testimony that Local 259 arbitrarily rejected applicants for membership. This local did limit its membership in number and gave preference to applicants who were sons of members; and we think it had this right.

The construction which complainants put upon the Sons' Resolution is not justified. Complainants contend that only sons of members are eligible for membership in Local 259. If this were true, there would have been no necessity of giving "preference" to such sons. The word "preference" shows that Local 259 was "open

to consider any and all applicants for membership, but the sons of members were to be preferred over other applicants. Over a period of several years, the sons of members were available to fill all vacancies in the limited membership of Local 259. On the other hand, it is entirely probable that there might not be enough applications at some time from sons of Local 259 members to fill the vacancies in the limited membership of this local. The sons might not want the jobs. In such event, Local 259 would undoubtedly accept members who were not sons of the members.

Complainants contend that they have a right to recover of Local 259 the 3% assessment which they paid into the treasury of this local. It is complainants' contention that defendants secretly, fraudulently, and deceitfully distributed the amount in the treasury of Local 259 of this 3% just before Christmas of each year to the members of this local. The foreign members and the local members paid the 3% assessment alike. In equity, complainants should not be permitted to enjoy all the benefits of Local 259 just like its members and give no consideration therefor. Such benefits are apparent: substantial salaries; favorable working conditions, including physical conditions and hours of work required each day; and the benefit of the union in negotiating agreements with the employers.

Article Nineteen, Section 27 of the Constitution and By-laws provides:

"No local union of this Alliance shall be allowed to charge members of affiliated sister local unions for the privilege of working within its jurisdiction, but any local which obliges its own individual mem-

bers to contribute a given percentage of their earnings, over and above the monthly dues, shall be permitted to collect from the members of affiliated sister local unions working within its jurisdiction the same percentage.''

In so far as Local 259 discriminated against complainants in the collection and distribution of the 3% assessment, defendants violated Article Nineteen, Section 27 of the Constitution and By-laws. Complainants should share equally with the members in this 3% fund. However, we have no doubt that complainants could have adjusted this matter through the methods provided within the Constitution and By-laws and rules of the union had they followed that course as they had contracted to do. Having failed to do so, they are not entitled to maintain this suit in equity to recover the amount which might be due them from the payment of this 3% assessment by them.

■ It is our conclusion that complainants cannot sustain their bill on the merits with the possible exception of the 3% claim; and they cannot maintain any part of their bill because they did not exhaust the remedies provided within the union.

■ A motion to strike certain assignments was filed by defendants on the ground that there was no contractual relationship between complainants and defendants, exclusive of the parent union. We reject this contention of complainants. The Constitution and By-Laws of the parent union was a contract binding on the parent union and on locals and their members in suits between the locals and the parent union; in suits between the locals; in suits by members against the parent union; in

suits between members and a local; and in suits between members of the same local or sister locals; when the questions in controversy grew out of union matters. The motion to strike is denied.

For the reasons stated in this opinion, the assignment of complainants is overruled; the assignments of defendants are sustained; and judgment will be entered in this Court dismissing complainants' bill, as amended, with all costs taxed against the original complainants, appellees in this Court, and their sureties according to law. Remand the cause to the Chancery Court of Hamilton County for such further proceedings, if any, which might seem proper to the Chancellor consistent with this opinion.

McAmis, P. J., and Hale, J., concur.