Grand Lodge of the Brotherhood of Railway and Steamship Clerks, Appellant, *v.* Girard Lodge No. 100, Appellant.

Argued November 18, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Walter Biddle Saul* and *Robert S. Marx,* with them *Allen S. Olmsted, 2nd* and *Leonard D. Slutz,* for plaintiffs.

*Isaiah W. Crippins* and *Lawrence J. Richette,* with them *Rufus Scoville Watson* and *Meehan, O'Brien & Richette,* for defendants.

OPINION BY MR. JUSTICE MUSMANNO, February 6, 1956:

This lawsuit involves an unfortunate dispute within the international labor union, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, made up of 1970 local lodges, and comprising a total membership of 350,000 persons. Each lodge of the Brotherhood elects a president, vice-president, recording secretary, financial secretary and other officers. One of these officers is known as the Chairman of Protective Committee. Where the membership of several lodges is employed within a certain division of a certain railroad, the chairmen of the protective committees of those lodges elect a Division Chairman who speaks for the membership of the Division in matters concerning grievances at division level. The division involved in the instant litigation is the Philadelphia Terminal Division of the Pennsylvania Railroad, made up of six lodges. The Division Chair-

man is Joseph P. Zawada, the stormy petrel of this controversy.

The Brotherhood has as many departments as there are railroads and the membership of the individual lodges is restricted to the employees working within the domain of one particular railroad or general carrier. There are some one hundred lodges in the Pennsylvania Railroad System. The union body at the head of these one hundred P.R.R. lodges is known as the Pennsylvania Railroad System Board of Adjustment, the chairman of which is S. V. W. Loehr, who is also a principal figure in the events presently to be narrated. The governing body of the entire Brotherhood is the Grand Lodge, with offices in Cincinnati, Ohio. The supreme officer is Grand President George M. Harrison.

In the year 1953 the Pennsylvania Railroad built in Philadelphia a new freight station, known, because of its location, as the Butler Street Station. Freight business theretofore handled at the Willow and Noble Street Stations of the Reading Railroad was now to be moved to the new P.R.R. Station opening January 4, 1954. The shifting of freight activities from the Reading stations to the P.R.R. station created problems with regard to the transferring of Reading employees, as well as employees of the Universal Carloading Company, a carrier also engaged in the operation at the Reading Stations. In addition, some Pennsylvania employees were to be drawn for Butler Street from the Ontario Street, Kensington and other Pennsylvania stations.

Every discontinuance of or reduction of personnel in a railroad enterprise, as indeed every closing of a mine or abandonment of a factory or mill, brings into the arena of perplexity the dilemma of what to do with

the men thrown out of employment. The men themselves understandably hope to find their vanishing job reappear at some other operation of the firm which shut down the mill, mine or factory or relinquished the railroad terminal. The difficulties at Butler Street were especially complicated because employees of two other companies were involved, namely, the Reading Company and the Universal Carloading Company. These employees, while members of the same Brotherhood, belonged to different lodges with their own individual chains of command. The officials at the head of the Universal and Reading departments of the Brotherhood were naturally anxious to see that their men received proper consideration in the setting up of the plan of reorganization at Butler Street.

Mr. Loehr, speaking for the P.R.R. employees, sought at General Manager level, to obtain the best concessions possible for P.R.R. men. The ranking officers of the Grand Lodge, however, owed a duty to the Universal and Reading employees as much as to the Pennsylvania employees, since all Brotherhood members, regardless of employing carrier, are entitled to equal protection under the aegis of the Brotherhood. Accordingly, in December, 1953, upper echelon officials of the Brotherhood, representing the involved employees of the Pennsylvania, Reading, and Universal companies, met with P.R.R. management to work out suitable arrangements for manning the Butler Street facility. No definitive agreement was reached at these meetings, although a temporary arrangement was approved pending final solution of all problems on the agenda of discussion.

On January 5, 1954, a further meeting was held. This time a representative of the Grand Lodge at the highest level, namely, a Vice Grand President (Mr.

Snedden), attended, in addition to five representatives of the P.R.R. employees, two representatives of Universal employees and one of Reading employees. In truly democratic fashion, proposals were made and debated. As is inevitable at all such negotiations, each side announced a position sufficiently beyond what it expected to attain so that it could then, in bargaining, withdraw some of its claims without loss of essential ground, while still hoping to secure and retain something in the way of a net gain.

In the re-employment of men who, prior to the consolidation at Butler Street, had had different employers, the question of seniority was a particularly thorny one. One's position on the seniority list often decides whether he can enjoy the sweetness of life in the comforting assurance of a permanent tenure or whether there shall hover over his job by day, and over his bed by night, the apprehension of bleak dismissal when work slackens, other consolidations occur, or technological developments eliminate further jobs. Mr. Loehr, upholding the demands of the P.R.R. employees and Mr. Holzhauser speaking for the Universal men were in sharp disagreement on the prerogatives of the men they respectively represented. Mr. Snedden, representing the entire Brotherhood, sought a middle ground on which all parties could stand with fairness, propriety, and honor. This meeting was followed by one on January 20, when, after an all-day discussion, the only possible solution, namely, compromise, was reached.

The following day, January 21, 1954, the P.R.R. management and the representatives of the P.R.R. employees, Universal employees, and Reading employees signed an agreement which provided that the P.R.R. was to employ certain men from Universal and others from the Reading Railroad, their seniority privileges

to dovetail into those of the P.R.R. men. This agreement (hereinafter to be called the Butler Street Agreement) did not satisfy all the P.R.R. employees because, in the nature of things, some had to be disappointed both as to employment and as to seniority. And from their dashed hopes followed events which finally culminated in this lawsuit.

During all the time that Mr. Loehr was pressing the claims of the P.R.R. employees, tempered somewhat by a realization that in conscience, justice, and fairness, the Universal and Reading employees could not be left out "in the cold," Mr. Zawada was striving toward that very end, namely, the freezing out of the Universal and Reading men. This, of course, he was doing out of what he regarded loyalty to the men he represented in the Brotherhood.

It will be remembered that Zawada's authority was limited to the Philadelphia Terminal Division. On that level, accordingly, on December 30, 1953, he conferred with officials of the P.R.R. and asked for positions, seniority rights and other advantages for the men in the lodges under his limited command. On the following day he wrote a letter to the Railroad's Division Superintendent enumerating the recommendations he had made. This letter became known among the thwarted P.R.R. employees as the "Zawada Agreement." It was, in fact, no agreement. In his acknowledgment of the letter, Mr. Kruggel, Superintendent of the P.R.R., wrote that the "sole purpose of the meeting of December 30, 1953, was to merely inform you of our plans to operate the facility at Butler Street, beginning on January 4, 1954," and he specifically declared that the letter "cannot in any manner be construed as an agreement."

Despite this repudiation by P.R.R. management of the unilateral so-called "Zawada Agreement," the P.R.R. men still clung to Zawada's letter as the life-raft of their hopes on the stormy seas of dissidence. Their resentment and indignation increased until it finally reached the tragic point of No Return. On January 28, 1954, four lodges of the Philadelphia Terminal Division met in an atmosphere of rebellion and formally resolved that they would not pay to the Grand Lodge the per capita shares of collected dues, unless and until the Butler Street Agreement was "scrapped." This action, of course, amounted to a defiance of authority which could only result in regretful consequences. Article 4, Section 9 of the Statutes for the Government of Lodges proclaims: "Should any lodge fail to make its quarterly per capita tax report and pay its per capita tax within the time limit specified in Section 8, Paragraph (a), above, it shall thereby forfeit its charter and become extinct."

Each member pays monthly dues in the sum of $2.75. One dollar of this amount, known as the "per capita tax", goes to the Grand Lodge. This per capita tax is to be paid by each lodge to the Grand Lodge quarterly in the month following the closing of each calendar quarterly. Thus, the per capita tax for the last quarter of 1953 was forthcoming, according to Section 8(a) of the Statutes, "within 30 days after the close of each quarter," (here December 31, 1953).

By February 1, 1954, (the deadline for the transmission of the per capita tax for the last quarter of 1953 to the Grand Lodge), the four recalcitrant lodges had not made the required remittance. The Grand Lodge, accordingly, under Article 4, sections 8 to 11 of the Protective Laws, declared that the four lodges had forfeited their charters. On February 5, 1954, the

Grand Lodge filed a complaint in equity praying that the Court of Common Pleas of Philadelphia order the four lodges to surrender all their supplies, books, records and funds to the Grand Lodge and that the defendant lodges be enjoined from dissipating any of the funds of the organization. The defendants filed a counterclaim, asking, inter alia, that the Court enjoin the plaintiff from interfering with the lodges.

On February 17, 1954, the Court ordered the maintenance of the status quo until "final hearing or further order of the Court." The Court then took voluminous testimony on the whole subject matter and on June 22, 1954, the Chancellor, Judge GRIFFITHS, filed an adjudication in which he found that the defendant lodges had indeed violated the constitution of the Brotherhood, but he concluded that forfeiture of the charters was too drastic a penalty for the adjudicated violation. He accordingly decreed that the defendant lodges were immediately to pay to the Grand Lodge all withheld per capita taxes and when that was done, the plaintiff Brotherhood was to withdraw its notice of forfeiture of the charters of the defendant lodges. Both parties took exceptions to the adjudication but the court en banc affirmed, with President Judge KUN filing a dissent. Both parties appealed to this Court.

Instead of discussing the appeals separately, we will consider the major questions involved in the entire litigation. Obviously the principal issue is whether a local unit of an international labor union may depart from the constitution, statutes and laws of the organization which it has itself accepted. The defendant lodges contend that under the accepted procedure of the Brotherhood, the Chairman of the Philadelphia Terminal Division, Joseph P. Zawada, was the only person authorized to deal with the Pennsylvania Railroad in connec-

tion with the questions seeking answer at the Butler Street Station. They argue further that since the Grand Lodge refused to concede this right, their only recourse was to withhold the per capita tax because appeal to the Brotherhood would have been "vain, illusory and nugatory." The fault in this line of argumentation lies in the fact that there is nothing in the constitution or laws of the Brotherhood which authorizes the withholding of funds from the parent body for any reason whatsoever.

The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, as already stated, is an enormous institution, being the largest of the Railway Brotherhoods. Nothing can be more important to the welfare and perhaps even the existence of the nation than that transportation, especially of food and other immediate necessities, over its vast network of railroads be unimpeded. The Brotherhood of Railway and Steamship Clerks has a tremendous responsibility in that it has contracted with practically all the carriers in the country to supply manpower needed to operate the transportation systems in its jurisdictional sphere. To the extent that the guiding and controlling force of the Brotherhood is retarded, harassed and obstructed by any of its subsidiary groups, to that extent the smooth and efficient working of the rail-carrying operations of the county is affected. It is obvious that to run an organization of this magnitude, revenue is imperative.

Money is the fuel with which any organization, whether it be governmental, industrial, commercial or even social, operates its machinery of accomplishment. Poets, philosophers and hermits may live, even happily, without capital, but no institution for hire can survive without the blood of finance coursing through its

arteries. It is manifestly for this reason that the organic instrument of the Brotherhood specifically, tersely and meaningfully announces that if a lodge fails to pay its per capita tax within the time indicated, "it shall thereby forfeit its charter and become extinct." The words have dramatic import. Unless the lodge furnishes the life-giving ingredient to the Grand Lodge it shall "become *extinct*," even as the parent body would become extinct if sufficient lodges refused to supply the transfusion of pecuniary life fluid needed for its existence.

The lower Court held that while the defendants failed to fulfill their duty and wilfully flouted the authority of the Brotherhood, "a judicial determination of forfeiture of the defendant lodges would be unconscionable." The lower Court seems to look upon the action of the Grand Lodge as one founded in vindictiveness and Shylockian excess, but in this the Court errs. No question of natural justice is involved. The Grand Lodge is not imposing a penalty which appalls a sense of fairness. In fact, penalization is not in issue at all. We are concerned here only with the matter of compliance with reasonable obligations undertaken contractually. A New Jersey case is in point. In *Kidde v. United Electrical*, 82 A. 2d 184, the question arose as to the propriety of forfeiture of a local's property to the parent body after disaffiliation of the local. The Supreme Court of New Jersey said: ". . . A provision for the transfer of the local's property to the parent body, in the event of the local's disbandment, does not constitute a penalty or forfeiture which the law will refuse to enforce. *The elements of a penalty are wanting*. The provision imposes no forfeiture for breach of the contract which in equity and right conscience is unenforceable. It is rather the exercise of

the basic freedom of contract in an area of action that does not trench upon the public interest or private right and justice, and not the advance setting by the parties of damages for breach of contract." (Emphasis supplied.)

The Court said further: "The issues are largely controlled by the principles governing contracts. Union membership derives from and depends upon the common consent of the parties, express in the constitution and laws of the association, and, while the law of contract does not rule all of its aspects, the relationship gives rise to interests of substance which the law will protect. Unless contrary to the public interest or the law of the land, the legal consequences of the compact are as stipulated by the parties; and thus in general the law treats the association as essentially contractual."

There is nothing in the forfeiture in the case at hand which is "contrary to public interest or law of the land." On the contrary the action of the Grand Lodge is one which makes for stability and order, and therefore benefits rather than harms the public weal. What was said in the *Kidde* case could well be said here: "The turnover of Local's property to the parent UE was not a forfeiture or penalty in the obnoxious legal sense. It was in keeping with a fundamental stipulation of the parties that is not in conflict with the law of policy."

A somewhat similar situation arose in the case of *Harker v. McKissock*, 81 A. 2d 480, where a local renounced affiliation with the national union but resisted forfeiture of its property, contrary to a specific provision to that effect in the constitution. Said the Supreme Court of New Jersey: "There is no reason of policy or consideration of natural justice forbidding the enforcement of the provision of National's constitution for the disaffiliation. The separation was the

voluntary act of the Local; and, while the right of disaffiliation was reserved, by common consent its exercise worked an automatic transfer of its property to National. This was a basic term in the agreement that brought about the confederation, and there is no rational ground for refusing performance of the stipulation."

Similarly, in the case at bar, the acts of the four dissident lodges "worked an automatic transfer" of their property to the Brotherhood. Even so, the results in the case at hand do not compare in hardship to the one cited, for here the money particularly belonging to the lodges will be transferred to the new lodges where the members finally find lodgment.

The action of the Grand Lodge is not one which came up over the horizon of surprise. The defendant lodges knew of Article 4, Section 9 before they took their belligerent stand on January 28, 1954. They were warned at that very meeting of the thin ice on which they stood as they contemplated the withholding of funds belonging to the Brotherhood. The lower Court found this to be an adjudicated fact: "Before the resolution was adopted, those present were warned that failure to pay the per capita tax might result in forfeiture of the charters of the lodges."

The defendant lodges were also aware, or, upon the slightest reflection, should have realized, that it was impossible under the existing circumstances for all their desires to be satisfied. When there are only five apples for six people, it is impossible for each person to receive a whole apple. As expressed by the Supreme Court of the United States in the case of *Ford Motor Co. v. Huffman,* 345 U. S. 330, 338: "The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be al-

lowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

"Compromises on a temporary basis, with a view to long-range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include different bases upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary."

Mr. Loehr had more authority to bargain for the P.R.R. employees than Mr. Zawada who was restricted to the handling of grievances at division level. Here in effect was a collective bargaining agreement which had to do with wages, working conditions, and seniority rights, all affecting the employees of three different carriers. Former employees of two companies (Reading and Universal) were to become employees of another company (Pennsylvania). This intricate and inter-company complication was utterly beyond Zawada's jurisdiction. In fact, as early as December 15, 1953, he seemed to recognize this. The lower Court found: "On December 15, Zawada wrote General Chairman Loehr that the matter was one that would have to be handled on a level higher than his."

The negotiators also had to keep in mind Resolution 249 which was adopted by the Grand Lodge Convention in 1939, reaffirmed by each succeeding convention and accepted by the defendants as having the force of a statute. That resolution declares: "That in all such future transfers, consolidations, coordinations, abandonments or dissolutions of existing facilities involving members and employes represented by our organization, which results in displacement of employes or rearrangement of forces, such members and employes shall have the right to follow their positions or work with their seniority rights; and be it further Resolved, that the Grand President shall enforce this policy of the Brotherhood and is authorized to decide (subject to review by the Grand Executive Council) disputes between two or more Boards of Adjustment involving such matters."

Because the defendant lodges did not obtain the preferences they sought, they charge that Loehr did not champion their cause in good faith. Loehr did the best he could. In fact, in his endeavor to get as much for the P.R.R. employees as possible he even argued for approval of the alleged "Zawada Agreement", but in this he was voted down.

The defendants contend further that the Grand Lodge is estopped from condemning the "Zawada Agreement" since Loehr, representing the Brotherhood at the higher level, knew of Zawada's negotiations prior to the Butler Street Agreement and did not ask him to discontinue his efforts in the direction they were pointed. But this is a complaint which Zawada had the right to make within the organization. If he felt himself aggrieved through indifference of his superiors, his appeal was to the Brotherhood itself. To this the Lodges say, as heretofore mentioned, that it would have

been "vain, illusory and nugatory" to apply to the Brotherhood for a redress of their grievances because they had discovered by past experience that their complaints fell on deaf ears. It is nonetheless established law that where private organizations are involved, recourse must be had to the organization itself before an appeal can successfully be lodged in the courts.* Of course, if the defendants believed that the Brotherhood had closed the door of reason to their just demands, they could then have applied to the Courts, but this should have been done while the lodges were still within the organization, not after they had sped through the red signal of Art. 4, Sec. 9, which warned them in huge symbols of the danger ahead. As stated by the Court of Appeals of the State of New York in the case of *Polin v. Kaplan,* 257 N. Y. 277, 281: "The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members. As the contract may prescribe the precise terms upon which a membership may be gained, so may it conclusively define the conditions which will entail its loss."

The Court of Errors and Appeals of New Jersey expressed the same idea as follows: "On the most elementary principles of equity it would seem that a subordinate organization which for so many years has reaped the benefits of its membership should be similarly charged with the corresponding burdens." (*Fidelity, &c., Co. v. Brotherhood,* 120 N. J. Eq. 346, 350).

One of the burdens of the lodges here was to pay into the Grand Lodge moneys collected for that very

---

* *Maloney v. United Mine Workers,* 308 Pa. 251, 257; *Hartley v. Brotherhood,* 277 N.W. 885, 888.

purpose. No matter from what angle one studies the situation, the resulting visualization is always the same, namely, the defendants had no legal, moral, or equitable right to the per capita tax. This tax was money collected for but one purpose—transmission to the Grand Lodge. The defendants explain that they were not really retaining the money, they were only holding it in escrow, but there is nothing in the constitution which allows them such a privilege. A street car conductor might find himself in serious trouble if he decided not to turn over the receipts of the day to the railway company but to hold them in "escrow" until some real or fancied complaint of his had been adjusted to his satisfaction. The lower Court properly held that the defendants' failure to pay the money to the Grand Lodge "was not due to inadvertence, mistake or financial inability, but was deliberate and intentional," that "'there was no justification for such withholding under any provision of the Constitution, Statutes or Protective Laws of the Brotherhood of which they are members or under any applicable law," and that the withholding of the money was a violation of the constitution which "was intentional and after warning of the consequences. No valid excuse therefor has been shown."

But after so categorical a finding, a finding which brought the defendants precisely within the forfeiture provision already cited, the Court then took its train of reasoning into the wrong station by concluding that there should be no forfeiture.

No labor organization worthy of the name could function if its integral units were permitted to retain funds needed to maintain headquarters and plan for the general welfare of the entire membership. No organization of any kind could survive if its constituent elements could formulate their own laws and rules

which would conflict with or override those they had accepted when they became part of the organization. Unbridled chaos would reign in the industrial world if individual locals could cancel out guarantees which the parent union had avowed. All the progress achieved by labor unions in behalf of better working conditions, proper returns, industrial peace and economic stability would be lost if locals could ignore the commitments made by the central organization and thus mutilate the pattern of understanding and good will reached between management and labor.

The Butler Street Agreement was one entered into between the Pennsylvania Railroad and the Brotherhood. It carried the seal of the Brotherhood and could not be summarily "scrapped" because of difference of views between four lodges of that Brotherhood and the organization itself consisting of 1970 lodges. The Pennsylvania Railroad would have something to say about the "scrapping" of an agreement into which it had entered with solemn undertakings and from which it had the right to expect faithful performance.

There is something else at stake. When a large and reputable labor organization, which the Brotherhood is, contracts with carriers that it will supply certain services, it in effect pledges that service to the people who are to utilize the facilities provided by the carrier involved. Public welfare would itself suffer if isolated segments of a labor union were allowed to ignore what the whole of the union has promised. The customers of the Butler Street Freight Station, as a section of the body politic, should not be required to undergo hardship and deprivation because of interruption of service resulting from a local lodge's contrary interpretation of a contract laid down by the Brotherhood itself.

Seniority rights are of vital importance but they do not rise higher than the obligations undertaken by a union with the industry it serves. In the case of *Hartley v. Brotherhood,* 277 N. W. 885, 887, the employment of the plaintiff, a married woman, was terminated when economic conditions made necessary the releasing of married women. She appealed to the courts. The Supreme Court of Michigan said: "The seniority rights acquired by her did not arise by virtue of her contract of employment with her employer, but existed by reason of the agreement of 1921 between the Railway and the Brotherhood. Ryan v. New York Cent. R. Co., 267 Mich. 202, 255 N.W. 365. This agreement was executed for the benefit of all the members of the Brotherhood, and not for the individual benefit of plaintiff. When, by reason of changed economic circumstances, it became apparent that the earlier agreement should be modified in the general interest of all members of the Brotherhood it was within the power of the latter to do so, notwithstanding the result thereof to plaintiff."

The contract entered into by a labor organization is necessarily executed for the benefit of all the members of that organization and not for any particular few, except, of course, where reference is made to specific individuals. A union local has no more power than that assigned to it by the parent body of which it is a part. It is not like a State in the United States which has inherent powers and retains all authority not delegated to the central government. In a labor union the central body is the custodian of the reservoir of power which it channels into the locals in such manner and according to such methods as will best serve the entire organization. That power may be shut off when it is abused by a local (under the constitution and laws which it has agreed to obey) and especially when that

abuse may jeopardize the standing, prestige and effi-
cacy of the central body. No far-flung organization,
whether it be in the fields of labor, military, industrial
or commercial, can achieve its objectives without in-
telligent direction which is obediently followed by its
integral parts. If every local component of a labor
union had the right to go its own way, the union would
eventually become a disconnected centipede with legs
proceeding in a hundred different directions.

The lower Court gave as another reason for declar-
ing the charter forfeiture unconscionable that under
forfeiture "the voting rights of each individual member
of the Defendants would be largely destroyed." But
this is a fear rising more from the mists of supposition
than from the substance of fact. Each member will still
maintain his right to vote in whatever lodge he may
eventually land. The lower Court rationalized that if
the members of the defunct lodges are assembled into
one temporary lodge, the other two remaining lodges
in the Philadelphia Terminal Division will be able to
outvote the temporary lodge in the election of a Divi-
sion Chairman. Since the Division Chairman is elected
for a term of four years and Zawada was elected in De-
cember, 1952, the next election would not take place
until December, 1956. It is not possible to say what
the organizational set-up of the Pennsylvania Railroad
will be almost one year from the present date. Fur-
thermore, as the matter of voting rights was not
averred in the pleadings nor considered at the various
hearings, this Court cannot pass upon a matter not in
the record.

Still seeking reasons to hold back what it regarded
as the heavy and unjust hand of forfeiture, the lower
Court declared that the lodges must be guilty of fail-
ing to send in reports *as well as* money before the fatal

hand can fall; and that since the lodges did transmit their reports they were thus only 50% guilty. It is true that Section 9 of Article 4 (supra) does say that forfeiture will result if a lodge fails "to make its quarterly per capita tax report *and* pay its per capita tax". (Emphasis supplied.) But the "and" here, obviously is one of Siamese import. It connects two propositions which are interdependent. The report without the money would be of no possible use, and it is almost impossible to assume that if the money were sent, a report would not accompany it. The report is practically the envelope for the money; and a pay envelope minus the pay could not accomplish much in the way of liquidating bills. President Judge KUN, in his dissenting opinion, well said: "Obviously, a Grand Lodge cannot pay death benefits (to say nothing of other services) with 'reports.' It must have funds to carry on its work. I cannot see how a lodge can avoid the consequences of non-payment of taxes due by merely sending in reports."

As regrettable and unfortunate as this entire controversy has been, the results of the forfeiture of the defendant lodges' charters are not as catastrophic as the lower Court seemed to believe. By forfeiture the lodges are required to turn over to the Grand Lodge the funds which do not belong to them in any event, but the rights of the members are protected; they are temporarily transferred to a new lodge to which they will pay their dues and, in accordance with section 11 of the Statutes, they have "the right to transfer within 30 days to a lodge of their own choice."

On February 27, 1955, on application by the defendants the Chancellor granted a rule directed to the plaintiff to show cause why it should not be held in contempt. On March 28, 1955, the Chancellor dis-

charged the rule to show cause. The defendants ask this Court to reverse the order. In view of the fact that the matters embraced in those proceedings have, because of our decision, become moot, we do not enter into a discussion of them and we affirm the Chancellor's action in discharging the rule.

The order of the Court below reinstating the defendant lodges is reversed, the defendant lodges will turn over to the Grand Lodge the charters, supplies, books, records, funds and other property belonging to the Grand Lodge under the forfeitures, and the defendant financial officers will account for all moneys received and spent by them since February 5, 1954. The record is returned to the lower Court for any further action as justice and equity may require in the effectuation of the decision of this Court, including the dismissal of the Counterclaim.

Costs to be borne, in both appeals, by the defendant lodges.

Mr. Justice BELL dissents.