Pennsylvania State Camp, Patriotic Order Sons of America *v.* Washington Camp No. 135, Appellant.

Argued April 24, 1956. Before STERN, C. J., JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Maynard Stapleton,* with him *J. F. Mahoney,* for appellants.

*Ralph M. Bashore,* with him *Orrin E. Boyle,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 25, 1956:

This controversy concerns the right of Pennsylvania State Camp, Patriotic Order Sons of America, to take

over the property of a local Camp upon the latter's expulsion from the Order.

Patriotic Order Sons of America, a fraternal and patriotic organization, was organized in 1847 as an unincorporated association. In 1866, 28 then existing local Camps united to form a State Camp. A constitution was adopted and the State Camp was incorporated under a special Act of February 27, 1867, P. L. 285, which provided that the persons therein named and their associates were created a body corporate by the name, style and title of the "State Camp of the Patriotic Order of Junior Sons of America of the state of Pennsylvania," with the power generally to "do all and singular the matters and things which may be lawful and necessary for the well being and due management of the affairs thereof." The Act further provided that the corporation should "consist of such persons as are now members, or shall be hereafter admitted as such, agreeably to the by-laws of said camp." By the Act of March 18, 1869, P. L. 396, the title was changed to the "State Camp of the Patriotic Order, Sons of America."

In 1887 the State Camp granted a charter to Washington Camp No. 135 located at Middleport, Schuylkill County. The charter recited that in accordance with the constitution, laws and rules of the National and the State Camp there was granted to the members of the local Camp full power to receive and initiate proper persons and instruct them in the workings of the Order on such rules and terms as the laws of the Order required, and to perform all the rights, duties and privileges of a camp of the Order, while they conformed to all the laws and rules thereof.

Camp No. 135 became incorporated in 1904 under the Act of April 29, 1874, P. L. 73. It continued as a subordinate Camp until 1947, when its charter was re-

voked, in accordance with the by-laws of the State Camp, because of failure to hold meetings, make reports and pay its per capita tax for several years, and also because its membership had dwindled to less than seven members in good standing. Thereupon the State Camp made demand on it to surrender its property and assets. It complied with the request as far as its charter, books, accessories and paraphernalia were concerned but it refused to give up its real estate, which consisted of a building or lodge hall it had owned since the year 1905; instead, it turned over possession of this property to the defendant George Rankin, one of its members, who is still collecting the rents therefrom and has refused to account for them to the State Camp. Accordingly, the latter instituted the present proceedings in equity praying that Rankin and all former members of Camp No. 135 be restrained from using the name of a Washington Camp, Patriotic Order Sons of America, that it be ordered to deed the real estate to the State Camp, and that Rankin be directed to account for moneys received by him as income from the property. After an extended hearing the court entered a decree granting the prayers of the bill, from which decree defendants appeal.

Defendants assert two defenses to the action, one, that the State Camp never had the legal power or authority to operate as a superior Camp under the lodge system and to create subordinate Camps, the other, that the revocation of the charter of the local Camp did not justify the attempt of the State Camp to confiscate its property. Neither of these claims is meritorious, and the decree of the court below will be affirmed.

It is true, as pointed out by defendants, we have held that a fraternal association incorporated under the General Corporation Act of April 29, 1874, P. L. 73, had no authority to create subordinate lodges, to accept

their fealty, or to appropriate their property: *Chosen Friends Castle No. 33, Knights of the Golden Eagle of Pennsylvania Appeal*, 342 Pa. 60, 20 A. 2d 237; *Grand Castle, Knights of the Golden Eagle of Pennsylvania, Association, v. Oley Castle No. 119, Knights of the Golden Eagle of Pennsylvania, Association*, 358 Pa. 440, 58 A. 2d 45. However, Pennsylvania State Camp, Patriotic Order Sons of America, was not incorporated under the Act of 1874 but under the special Act of 1867. When incorporated it had already been in existence as a patriotic fraternity for a period of 20 years, there were also subordinate Camps then in existence (indeed the very incorporators of the State Camp were members of these local Camps), and the legislature presumably recognized this situation for it provided that the corporation should consist of the then present members as well as those thereafter admitted. The organization and workings of a fraternal order of this nature were undoubtedly well understood and it must be assumed that the State Camp was impliedly given by its charter of incorporation the power and authority to appoint agents and to license subordinate Camps to carry out the purposes of the Order; it could scarcely have been conceived that a State Camp would exist without local subordinate Camps. In *Commonwealth ex rel. v. Heilman*, 241 Pa. 374, 88 A. 666, it was held that, where National, State and subordinate Councils of a fraternal Order formed a harmonious, orderly system for the transaction of the business of the Order and the promotion of the principles for which it was organized, the incorporation of the State Council did not create a new society but simply gave the existing body a corporate form. In *Schriner v. Sachs*, 253 Pa. 611, 616, 98 A. 724, 725, it was similarly declared that the incorporation of a lodge, there known as a "Circle," did not affect the relation between the Supreme Circle and the subordinate bodies

which had previously existed prior to the incorporation of the parent body. Both of these cases were cited with approval and followed in *Nokomis Tribe No. 307, Improved Order of Red Men of Pennsylvania Dissolution Case,* 331 Pa. 53, 200 A. 23, which, in turn, was approved as to this principle in *Grand Lodge of Knights of Pythias v. Samson Lodge, No. 67,* 355 Pa. 571, 50 A. 2d 363. By the same token, the incorporation of Camp No. 135 in 1904 did not in any way change its previous status as a subordinate lodge of the State Camp. Moreover, it is highly doubtful whether, in any event, it lies in the mouth of Camp No. 135 to challenge the power of the State Camp to have issued to it the charter under which it operated for more than 60 years and the benefits of which it enjoyed during that entire period. From the time of receiving its charter from the State Camp, it continuously initiated new members into the Order according to its ritual, sent delegates to the sessions of the State Camp, made annual reports of its financial condition, and continued to use the rituals of the Order in operating as a Camp of the Order, thus clearly acknowledging its subordination to the constitution and laws of the parent body; moreover each and every member at the time of his initiation took a solemn oath to support and obey the constitution and by-laws of the organization.

Article II of the Constitution of the State Camp provided that the State Camp should be the head of the Order in the State of Pennsylvania and that its proceedings should be binding on all Camps within its jurisdiction. Article II of the General Laws of the Order provided that the State Camp should have the power to annul the charter of a local Camp for any of certain specified causes. Article XVII of the Constitution of the State Camp provided that in case of the forfeiture of the charter of a subordinate Camp the members there-

of should surrender all its property and effects of every description. Article XXVII of the General Laws declared that all property, moneys and effects of subordinate Camps were held in trust for the purposes of the Order, and any division, distribution or appropriation of such property, moneys and effects among the members of such Camp was strictly forbidden, the parent body having the right to proceed in law and equity to recover from the person or persons who may have received such property, moneys or effects. All these provisions entered into the contract established by Article XXXIII, Section 34, of the General Laws, which provided that the Certificate, the Charter, the Constitution and Laws of the National, State and subordinate Camps, and the application for membership in the Order signed by the applicant, should constitute the contract between the Order and the members. Such a contract having been entered into, it cannot be violated by the subordinate Camp or by the members thereof: *Commonwealth v. Heilman,* 241 Pa. 374, 378, 88 A. 666, 667, 668; *Grand Castle, Knights of Golden Eagle, v. Taylor,* 278 Pa. 9, 122 A. 210; *Nokomis Tribe No. 307, Improved Order of Red Men of Pennsylvania Dissolution Case,* 331 Pa. 53, 56, 200 A. 23, 24, 25; *Grand Lodge of the Brotherhood of Railway and Steamship Clerks v. Girard Lodge No. 100,* 384 Pa. 248, 120 A. 2d 523. See also *Harker v. McKissock,* 7 N.J. 323, 329, 81 A. 2d 480, 482, 483; *Walter Kidde & Co., Inc. v. United Electrical, Radio & Machine Workers of America, CIO,* 7 N.J. 528, 531, 82 A. 2d 184, 186.

In the case of *Grand Castle, Knights of Golden Eagle, v. Taylor,* 278 Pa. 9, 122 A. 210, it was said (p. 18, A. p. 213) : "... there is no question of forfeiture of property; this is simply the case of delivering up 'funds' in accordance with the terms of an agreement which stipulates that, in the event of dissolution of the sub-

ordinate association, its 'funds and other property' shall be surrendered to the head of the order, to be held in trust primarily for the benefit of those who contributed to them, . . . ."

In the case of *Grand Lodge of the Brotherhood of Railway and Steamship Clerks v. Girard Lodge No. 100*, 384 Pa. 248, 120 A. 2d 523, it was said (p. 257, A. p. 527) : "No question of natural justice is involved. The Grand Lodge is not imposing a penalty which appalls a sense of fairness. In fact, penalization is not in issue at all. We are concerned here only with the matter of compliance with reasonable obligations undertaken contractually."

In *Harker v. McKissock*, 7 N.J. 323, 81 A. 2d 480, it was said (pp. 330, 331, A. p. 483) : "There is no reason of policy or consideration of natural justice forbidding the enforcement of the provision of National's constitution for the forfeiture of Local's property in the event of disaffiliation. . . . This was a basic term in the agreement that brought about the confederation, and there is no rational ground for refusing performance of the stipulation."

In *Walter Kidde & Co., Inc. v. United Electrical, Radio & Machine Workers of America, CIO*, 7 N.J. 528, 82 A. 2d 184, it was said (p. 532, A. p. 186) : "This, too, is the rationale of the doctrine that a provision for the transfer of the local's property to the parent body, in the event of the local's disbandment, does not constitute a penalty or forfeiture which the law will refuse to enforce. The elements of a penalty are wanting. The provision imposes no forfeiture for breach of the contract which in equity and right conscience is unenforceable. It is rather the exercise of the basic freedom of contract in an area of action that does not trench upon the public interest or private right and justice, and not the advance setting by the parties of damages for breach

of the contract. . . . The turnover of local's property to the parent UE was not a forfeiture or penalty in the obnoxious legal sense. It was in keeping with a fundamental stipulation of the parties that is not in conflict with law or policy."

Defendants rely largely upon the cases of *State Council Junior Order of United American Mechanics of Pennsylvania v. Emery*, 219 Pa. 461, 68 A. 1023, and *Grand Lodge of Knights of Pythias v. Samson Lodge, No. 67*, 355 Pa. 571, 50 A. 2d 363, each of which held that where a subordinate lodge of a beneficial association created a fund for sick and death benefits the revocation of the charter of the lodge by the supreme body did not entitle the latter to appropriate it.* The cases thus cited, however, are distinguishable in that it was pointed out in each of them that the parent body did not have any provision for the collection or payment of any such benefits and that all the beneficial features of that nature were left to the care of the subordinate councils or lodges. In the present case, on the contrary, there are provisions for maintaining, under State Camp administration, the beneficial interests of members of local Camps which have become defunct. The State Camp has expressly disclaimed any intention on its part to use any of the funds or property taken over from Camp No. 135 for any purposes other than those for which the Order was organized, and it declares that it will duly protect as trustee all existing beneficial rights, if any, of the members. In *Grand Castle, Knights of Golden Eagle, v. Taylor*, 278 Pa. 9, 122 A. 210, the parent body was permitted to take over the beneficial

---

* It does not clearly appear in the present case that Camp No. 135 had adopted a system of beneficial payments; if any such funds did exist they were apparently never separated from the general funds or other property of the Camp.

funds of the subordinate association because there was a provision in the constitution of the Grand Castle that it would act as trustee to take charge of any money intended for sick and death benefits and apply it to the purposes for which it was intended. Similarly, in *Nokomis Tribe No. 307, Improved Order of Red Men of Pennsylvania Dissolution Case,* 331 Pa. 53, 200 A. 23, it was held that the parent body could take over the benefit funds of the local lodge, to be administered by it in trust for those entitled thereto.

The decree is affirmed, each party to bear its own costs.