## Philadelphia and Reading Coal and Iron Company Miners' and Laborers' Beneficial Fund.

Argued May 3, 1971. Before BELL, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*W. J. Krencewicz,* with him *Peter Krehel,* for appellants.

*Robert M. Zimmerman,* with him *Zimmerman, Lieberman & Derenzo,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

A dispute concerning disbursements of the Miners' and Laborers' Beneficial Fund of the Philadelphia and Reading Coal and Iron Company presents us with numerous issues, the principal ones being whether the fund is a beneficial association or trust fund; whether the benefits can include disability caused by anthracosilicosis; whether the fund has been correctly administered according to reasonable rules; and whether the

doctrine of cy pres should apply. We affirm the chancellor's decree confirming the "trustees" account and holding that the fund is a beneficial association which has been properly administered. Benefits have been duly extended to the occupational disease of anthracosilicosis, and the fund cannot be considered as a charity; hence cy pres has no relevance in the present litigation.

Little disagreement exists as to the pertinent factual background. On March 14, 1877, the company's board of directors adopted a resolution proposing the establishment of ". . . a scheme for the better protection and care of the Employees of the Company who may be injured or killed through accident in the discharge of their duty. . . ."[1]

The plan was presented to the miners and laborers on March 17, 1877, and provided for payment of benefits to employees if they were contributors to the fund. The company donated $20,000 as an initial endowment. Membership in the association was voluntary and clerical and administrative expenses were to be borne by the company. Under the plan, to be entitled to benefits for injury, an employee had to furnish a ". . . certificate of a reputable physician that the disability is the result of an accidental injury."[2] The fund was to be administered by a board of trustees composed of the president of the company or its successors, the president judge of the Common Pleas Court of Schuylkill County, and a president of a local banking institution.

The fund's operation was suspended in 1915 with the enactment of workmen's compensation laws, but the assets were not liquidated or disbursed. At the employ-

---

[1] Abstracts of Minutes of Corporate Meetings of The Philadelphia and Reading Coal and Iron Company (hereinafter referred to as Minutes), March 14, 1877.

[2] Minutes, March 17, 1877.

ees' request, the fund was reestablished on October 15, 1919, ". . . on the same basis as it was formerly operated prior to the discontinuance on December 31, 1915."[3]

From time to time the plan was amended to provide for increases in contributions and benefits. Then on July 22, 1955, the trustees adopted a resolution again increasing the benefits and extending coverage to contributors actively employed by the company as of January 1, 1955, who suffered total disability due to anthracosilicosis. The resolution was submitted to a vote of the 1015 contributors then employed by the company. 850 ballots were returned, and the resolution received overwhelming approval. No votes were cast against the proposal to include benefits for anthracosilicosis.

Pursuant to the 1955 amendments, the trustees adopted rules of eligibility providing that to be entitled to benefits employees (a) had to be contributors to the fund; (b) had to be actively employed by the company or its named subsidiaries as of January 1, 1955; (c) had to file an occupational disease naming the company or its subsidiaries as the last employer; (d) had to recover an occupational disease award from the Commonwealth with a finding of total disability from anthracosilicosis; and (e) had to obtain a decision or opinion of the compensation authorities naming the company or its subsidiaries as the last employer. Finally, the rules provided that any employment intervening between the date of total disability from anthracosilicosis and the date of last employment with the company rendered the claim ineligible.

The company and its subsidiaries ceased operations as of February 1, 1961, and has employed no miners or laborers since that time. No further contributions have been made to the fund. The trustees have continued

---

[3] Minutes, October 15, 1919.

their administrative duties, making payments to those claimants who in their opinion were entitled to relief under the rules. Beginning in 1963, several actions were commenced by persons claiming an interest in the fund. Presumably because of the threat of numerous lawsuits, the surviving trustees turned to equity and filed a petition for confirmation of account on November 9, 1964, in hopes of avoiding a multiplicity of suits. The account covered a period from December 31, 1934, to October 31, 1964, and indicated a balance of $73,447.83 consisting of cash and securities available for distribution.

On January 9, 1965, exceptions to the account were filed by Peter Meyer, a contributor to the fund, challenging the propriety of the $488,077.69 paid since 1955 in benefits for anthracosilicosis and requesting the imposition of a surcharge. A petition for cy pres was filed on the same day by Thomas F. McAndrew, another former contributor, who is now deceased and whose administratrix has been substituted as a party.[4]

---

[4] Both exceptant Meyer and petitioner McAndrew made claims against the fund. An exhibit attached to the master's report listed all of the known claimants up until September 12, 1966, and classified them in various categories, indicating whether their claims had been accepted or rejected and the reasons for the trustees' action. Petitioner McAndrew's claim was listed among those denied because:

"1. An occupational disease petition has not been filed naming the Philadelphia and Reading Coal and Iron Company (Philadelphia and Reading Corporation) or its named subsidiaries, as the last employer.

"2. The decision or opinion of the compensation authorities did not name the Philadelphia and Reading Coal and Iron Company (Philadelphia and Reading Corporation) or its named subsidiaries, as the last employer."

Exhibit D, schedule 2.

Exceptant Meyer's claim was listed among those denied because:

"1. [same as above]

Hearing and argument were held before the court en banc on January 11, 1965, after which the court directed all persons claiming an interest as a proper recipient of the fund's benefits to register their claims. Approximately 600 claims were filed.

The court then appointed a master, who eventually submitted a report and recommendations. His findings confirming the account were affirmed by the court on April 24, 1967. Exceptions were taken, and on June 11, 1969, the court en banc vacated the previous order primarily because the master ". . . did make Findings of Fact, Conclusions of Law and recommendations to the Court which are purely judicial functions and his appointment with respect to such duties was improper." The court itself then scheduled hearings in late June, 1969, to determine inter alia the nature of the fund, and the extent of trustees' powers of administration, and their authority to promulgate rules. On June 8, 1970, the chancellor confirmed the account in all respects and dismissed the cy pres petition and exceptions to the account. After slight modification, the decree nisi was affirmed and made final on November 23, 1970. The instant appeals of exceptant Meyer (No. 228) and petitioner McAndrew (No. 229) were consolidated and will be treated together in this opinion.

## Appeal No. 228

Exceptant argues that the trustees were without authority to extend the fund's benefits to anthracosili-

---

"2. [same as above]

"3. There was intervening employment between the date of total disability from occupational disease and the date of the last employment with the Philadelphia and Reading Coal and Iron Company (Philadelphia and Reading Corporation) or its named subsidiaries."

Exhibit D, schedule 4.

cosis. He asserts the fund is a trust, and as such, neither the trustees nor the miners and laborers actively employed by the company in 1955 possessed the authority to "divert" the funds for occupational disease benefits without the approval of all the contributors or "settlors". We are unpersuaded.[5]

The underlying issue is whether the fund is a beneficial association or a trust. The heyday of beneficial associations was during the latter part of the nineteenth century and the principles governing these entities have remained unchanged since that time. As was stated in *Commonwealth v. Equitable Beneficial Association*, 137 Pa. 412, 18 Atl. 1112 (1890) : "What is known as a beneficial association, however, has a wholly different object and purpose in view [than an insurance company]. The great underlying purpose of the organization is not to indemnify or to secure against loss: its design is to accumulate a fund from the contributions

---

[5] We bear in mind our limited scope of review in these situations.

"At the outset of this case we are confronted by a rule of this Court which has the effect of a rule of law. *We will not retry this case.* The question for us to consider is, first, whether there is evidence to support the findings of fact and whether the findings of fact support the decree. The court below and the court en banc made a thorough review of all the evidence and arrived at certain findings. If the evidence supports the findings and the findings in turn justify the decree, the decree will not be set aside. . . .

"*It must be thoroughly understood that, in cases of this character, the findings of the chancellor supported by the court en banc must be considered just as binding on appellate courts as the verdict of a jury.* Of course, if there is no evidence to support them or if it appears from the record that there is a capricious disbelief of evidence then the findings are worthless." *Pusey's Estate*, 321 Pa. 248, 260-61, 184 Atl. 844, 849-50 (1936) ; accord, *Shewchuk Estate*, 444 Pa. 249, 282 A. 2d 307 (1971) ; *Mintz Trust*, 444 Pa. 189, 282 A. 2d 295 (1971) ; *Rozik v. Monongahela Valley Enterprises, Inc.*, 444 Pa. 594, 282 A. 2d 711 (1971) ; *O'Conner Appeal*, 444 Pa. 206, 283 A. 2d 279 (1971).

of its members, 'for beneficial or protective purposes,' to be used in their own aid or relief, in the misfortune of sickness, injury, or death. The benefits, although secured by contract, and for that reason to a limited extent assimilated to the proceeds of insurance, are not so considered. Such societies are rather of a philanthropic or benevolent character: their beneficial features may be of a narrow or restricted character; the motives of the members may be to some extent selfish, but the principles upon which they rest is founded in the considerations mentioned. These benefits, by the rule of their organization, are payable to their own unfortunate, out of funds which the members have themselves contributed for the purpose, not as an indemnity, or security against loss, but as a protective relief in case of sickness or injury, or to provide the means of a decent burial in the event of death. Such societies have no capital stock. They yield no profit, and their contracts, although beneficial and protective, altogether exclude the idea of insurance, or of indemnity, or of security against loss." Id. at 419-20, 18 Atl. at 1113; accord, *Blair v. Supreme Council American Legion of Honor*, 208 Pa. 262, 57 Atl. 564 (1904); *Incorp. of National Etc. Endowment Co.*, 142 Pa. 450, 21 Atl. 879 (1891); *Cimprich v. Pennsylvania Railroad Company*, 119 Pa. Superior Ct. 5, 180 Atl. 51 (1935). See generally, 5 P.L.E. Beneficial Associations §1 (1958).

Having examined the 1877 agreement, we conclude the company and its employees established a beneficial association. Exceptant points to the term "trustees" describing the administrators of the fund as being probative of the establishment of a formal trust. One of the fundamental elements in the creation of a trust is the manifestation of the settlor's intent: "A trust, as the term is used in the Restatement of this Subject, when not qualified by the word 'charitable', 'resulting' or 'constructive', is a fiduciary relationship with re-

spect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a *manifestation of an intention* to create it." Restatement (2d) Trusts, §2 (1959) (emphasis added).

The 1877 agreement manifests a clear intention to create a beneficial association. Such a fund unquestionably has elements of a trust, and its administrators are in a fiduciary relationship with the contributors. However, the existence of a fiduciary relationship does not call into being a formal trust. Corporate directors serve in a fiduciary relationship to a company's shareholders, yet it would never be contended that a corporation has to be managed in the same fashion as a trust fund.

Similarly, we are unpersuaded by exceptant's assertions that the fund here at issue had to be administered according to formal rules of trust. The original 1877 resolution contained no provision for amendment. From the beginning, as we interpret the association's rules, only contributors "actually injured in the employment of the Company" were entitled to benefits. Membership in the fund undoubtedly terminated with severance of the employment relationship. Hence, we agree with the chancellor that it was entirely reasonable for the trustees to restrict the 1955 vote to those actively employed by the company. Although prior to 1955 the trustees alone had changed the rates of contribution and benefits on ten occasions, we would be presented with a more difficult question had they unilaterally enlarged the fund's purposes. But that is not our case. The trustees submitted the question of the anthracosilicosis benefits to the then contributors, and not a single vote was cast in opposition to that portion of the resolution. The amendment extending benefits to anthracosilicosis approved by the majority was entirely proper.

Exceptant places great reliance on the case of *Leatherman v. Wolf*, 240 Pa. 557, 88 Atl. 17 (1913) where this Court affirmed the trial court's disallowance of a diversion of a society's funds in a per curiam opinion. We deem the case distinguishable, because in *Leatherman*, the society was raising public funds for the benefit of a national orphans' home and the proposed amendment would use the funds for a local home supporting orphans' of former members.[6] In the instant case, the funds were supplied solely by the company and its employees. The entire active membership was afforded the opportunity to vote in 1955, and no one voted against the inclusion of anthracosilicosis benefits.

Additionally, we concur with the chancellor that the rules governing occupational disease benefits adopted by the trustees subsequent to the passage of the amendment were entirely reasonable. The provisions of the 1877 resolution provided that ". . . in all cases the decisions of the trustees, either as to the liability of the funds or as to the proper recipient of its bounty, shall be final and conclusive upon all parties." The rules adopted were well within their lawful discretion. We also note that although we have treated exceptant's contentions on their merits, we question his standing to raise objections in 1965 to amendments adopted in 1955.

## Appeal No. 229

It is contended on petitioner's behalf that the purposes of the fund are charitable. As the company has been out of business since 1961, petitioner (now his estate) asserts that a cy pres decree should be entered authorizing the trustees to pay benefits for occupational diseases to persons designated by the court; how-

---

[6] It is to be noted that in *Leatherman*, the amendment was approved, but only funds raised subsequent to the amendment could be employed for the society's new purpose.

ever, the court should pay no heed to the existing "discriminatory" rules of the trustees as to distributions.

The doctrine of cy pres is well established. "If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor." Restatement (2d) Trusts, §399 (1959). See also *Bangor Park Association Case,* 370 Pa. 442, 88 A. 2d 769 (1952); *Wilkey's Estate,* 337 Pa. 129, 10 A. 2d 425 (1940). Crucial to its operation is the existence of a charitable trust.

We have, as noted above, concluded that the fund was a beneficial association. Even were we to consider it a trust, we would be constrained from applying the doctrine, because the chancellor's finding that the fund was not a "charity" certainly possesses substantial evidentiary support. The fund's benefits extend only to the employees of a particular company and its subsidiaries if they are injured on the job or can prove they were employed by the company when they contracted anthracosilicosis, and there has been no intervening employment.

We have likewise already observed that the chancellor did not abuse his discretion in determining that the rules adopted by the trustees in 1955 were reasonable. As of May 31, 1969, $51,065.65 in valid claims had been tentatively allowed by the trustees. In all probability the fund will be exhausted as more valid claims are submitted. Also, the amount a beneficiary receives varies as payments are made on a periodic basis for the duration of the injury up to a period of

four years. The administration of the trust has been entirely proper.

Accordingly, the decree of the Court of Common Pleas of Schuylkill County is affirmed. Each party to pay own costs.

Mr. Justice JONES took no part in the consideration or decision of this case.