[No. 5039–4–III.   Division Three.   July 26, 1983.]

THE NATIONAL GRANGE OF THE ORDER OF PATRONS
OF HUSBANDRY, ET AL, *Respondents,* v.
O'SULLIVAN GRANGE NO. 1136,
ET AL, *Appellants.*

*Darrell E. Ries* and *Ries & Kenison,* for appellants.

*Donald K. Franklin,* for respondents.

GREEN, J.—O'Sullivan Grange 1136, a member of the Order of Patrons of Husbandry, conveyed by quitclaim deed the real property on which its grange hall was located and delivered personal property valued in excess of $25,000 to O'Sullivan Community Center between December 1979 and July 1980. This transfer did not have the consent of the master of the Washington State Grange. The trial court (1) ordered the Community Center to reconvey the real property and return the personal property, and (2) permanently enjoined O'Sullivan Grange from future conveyance of the property without complying with the requirements of the National Grange, including the consent of the master or executive committee of the State Grange. The propriety of this judgment presents the underlying issue on appeal.

Unchallenged findings of fact show: The Order, of which O'Sullivan is a member, is a fraternal society consisting of the National Grange (a national representative body), state granges (state delegate bodies), pomona granges (district membership granges), and subordinate granges (membership granges). O'Sullivan is a subordinate grange.

The National Grange was incorporated by an act of the Kentucky Legislature in 1876 with its object "the promotion of agricultural and other kindred pursuits by inducing co–operation among farmers and those alike interested for their mutual benefit and improvement . . ." National is the controlling supervisory body and adopted a constitution and bylaws governing the organization and operation of the

Order. The constitution and bylaws, as well as other rules and decisions adopted by National to govern the Order, are contained in the *Digest of the Patrons of Husbandry* (Digest). The record indicates it is the handbook for operating the member granges.

Subordinate granges, such as O'Sullivan, participate and voice their views in the affairs of the National Grange through their representatives. The masters of the subordinate granges or their elected alternates are delegates to annual meetings of the state grange. The masters of the state granges and their wives or husbands are voting delegates at the annual session of the National Grange which may frame, amend or repeal the constitution, bylaws or other rules of the Order.

O'Sullivan was formed and received its charter from the National Grange in April 1956. The charter provided that grange members would

at all times comply with the Constitution of the National Grange and of the State Grange . . . and all laws, rules and regulations passed in accordance therewith.

Shortly thereafter, O'Sullivan was incorporated under the laws of this state. Its articles of incorporation state:

The name of the grand body from which this Grange derives its rights and powers as such Grange is The National Grange, Patrons of Husbandry.

Persons who apply for membership in O'Sullivan do so on forms prepared by the State Grange as prescribed by National which recite in part:

Should my petition be granted I promise a faithful compliance with the Bylaws of this Grange and the Constitution and Laws of the State and National Granges.

Members upon their initiation and officers upon their installation repeat this promise under oath.

At the time O'Sullivan was chartered and incorporated, chapter 9, section 15 of the Digest prohibited a subordinate grange from transferring real property, except after (1) proper notice to the membership and resolution approved by a two–thirds vote of the grange, and (2) approval of the

executive committee or master of the state grange.

In 1978, section 15 was amended by vote of the National Grange to require a subordinate grange that is authorized to sell its real property to "account for all monies received in the transaction and . . . remit all but the sum of $1,000 of such proceeds to the State Grange." It further provides the state grange shall hold the proceeds in trust for the benefit of the subordinate grange to use for any purpose approved by the state master and executive committee. If the subordinate grange ceases to function and is not reorganized within 7 years, the trust ceases and the proceeds become the property of the state grange to be used for the general purposes of the Order.

Chapter 9, section 16 of the Digest provides that any subordinate grange property which is not disposed of when it ceases to function may be liquidated by the state grange who must hold the proceeds in trust for a specified period. The proceeds become the property of the state grange unless the subordinate grange reorganizes within that time. Chapter 9, section 14 specifies that "in no event shall the assets of any Grange be divided among the members of the Grange pro–rata or otherwise."

O'Sullivan's bylaws provided:

Sale, purchase, or lease of real estate by this Grange shall be executed only in accordance with the provisions set forth in the Digest, Page 59, Sec. 15.

O'Sullivan acquired property and built a community hall from funds raised by a locally controlled hunting program. It operated as and accepted the benefits of a subordinate grange by adopting bylaws, electing officers, holding meetings, selecting committees, admitting new members, collecting and paying dues to the State Grange, filing quarterly reports, sending delegates to State Grange annual meetings and participating, through its individual members, in grange sponsored contests, programs and activities. The grange hall served as a center for meetings and activities of both the grange and various community groups who paid rental fees that were used to defray O'Sullivan's costs

of ownership and operation.

By November 13, 1979, interest and participation in O'Sullivan declined and on that date the members adopted a motion to dissolve. From December to February, the members met to organize "O'Sullivan Community Center" which would take title to and maintain grange assets, including the grange hall. It is undisputed that their intention was to avoid reversion of O'Sullivan Grange property to the State Grange.

On December 11 O'Sullivan, without consideration, authorized the transfer of $1,000 to the Community Center. Also during their meetings, after sections of the Digest pertaining to dissolution and distribution of subordinate grange properties were read, O'Sullivan's members voted to delete their bylaw which required compliance with section 15 of the Digest. They notified the State Grange, which responded they were, nevertheless, required to comply with that provision.

On April 18, 1980, O'Sullivan Community Center was incorporated. The elected officers and directors, with one exception, were members of O'Sullivan. A resolution was adopted authorizing the transfer of O'Sullivan grange hall property to the Community Center, a copy of which was mailed to the State Grange. The State again reminded O'Sullivan of the Digest requirements.

On April 29 O'Sullivan transferred, without consideration, $9,024.37 from its checking account to the Community Center's account. On May 15 the grange hall was conveyed to the Community Center by quitclaim deed which recited "To clear title to real estate only." The excise tax affidavit reveals there was no consideration for the conveyance. On July 14, 800 shares of Pacific Power and Light stock valued at $17,280 were transferred to the Community Center without consideration.

After the State Grange threatened litigation and O'Sullivan and the Community Center obtained new counsel, the Community Center executed a lease–back agreement to O'Sullivan whereby O'Sullivan was permitted to use the

hall for its grange meetings and the Community Center would keep and maintain the property.[1]

The National and State Grange and Mrs. W. P. Kaddatz, a charter and current member of O'Sullivan, commenced this action against O'Sullivan and the Community Center to set aside the transfer of the grange hall and for an accounting and return of the personal property. They also sought a permanent injunction against any future transfer of the real property without consent of the executive committee or master of the State Grange. The trial court entered judgment in favor of the Granges and Mrs. Kaddatz, ordered the property returned and granted the injunction. O'Sullivan and the Community Center appeal.

O'Sullivan and the Community Center contend the court erred in determining transfer of the grange hall was a breach of contract between O'Sullivan, the Order and its members and was ultra vires. It is argued (1) the National Grange amended the Digest without O'Sullivan's approval and therefore the parties did not treat the relationship as one of contract; (2) even if there was a contract, it did not limit O'Sullivan's corporate power to amend its own bylaws by deleting the requirement that it comply with the Digest—thus eliminating the restriction on conveyance; and (3) the consent provision is a restraint on alienation and there is insufficient proof the restraint is reasonable. We disagree.

It has long been established the constitution and bylaws of the national or governing body of a beneficial association or fraternal order are binding upon the subor-

---

[1] O'Sullivan and the Community Center challenge the court's finding that the lease–back did not constitute sufficient consideration for transferring the hall. The testimony is disputed whether there was ever any discussion concerning O'Sullivan's leasing the Community Center before the lease agreement was signed. In light of this testimony and the unchallenged finding that O'Sullivan had adopted a motion to dissolve, the court could infer the lease–back arrangement was merely a paper transaction to create consideration where there was none. The court's finding was not in error.

dinate organizations.[2] All the rights and powers of the order are derived from those laws. F. Bacon, *Benefit Societies and Incidentally of Life Insurance* §§ 68, 69, 77 (1888). The members of the local organizations are also members of the order, which can function only through them. *See Pennsylvania State Camp v. Washington Camp 135*, 385 Pa. 492, 123 A.2d 701, 703 (1956). By virtue of their charter, they agree to be bound by the laws of the order adopted by their delegates and any subsequent amendments authorized by those laws. *Polish Falcons of Am. v. American Citizens Club*, 338 Pa. 218, 13 A.2d 27 (1940).

Here, O'Sullivan and its members expressly agreed to abide by the constitution and laws incorporated into the Digest when they applied for and accepted their charter. The members took an oath to that effect. The court's unchallenged findings state the National Grange has legislative and executive powers over the subordinate granges; it may frame, amend, or repeal laws in the Digest as the good of the Order requires; and all subordinate granges must conform to those laws. O'Sullivan, through its elected representatives, had a voice in enacting those laws. Consequently, O'Sullivan had no authority to convey the grange hall without consent of the executive committee or master of the State Grange as required by the Digest.

■ O'Sullivan's effort to amend its corporate bylaws by deleting the provision requiring it to comply with section 15 of the Digest could not change its contract with the Order. To the contrary, incorporation of a subordinate organization does not change its purpose or status as an extension of the supreme body. Nor does it affect the charter and oath to obey the constitution and bylaws of the Order. *See,*

---

[2]*Preveden v. Croatian Fraternal Union*, 120 F. Supp. 33, 35 (W.D. Pa. 1954); *Grand Lodge v. Osceola Lodge 18*, 178 N.W.2d 362 (Iowa 1970); *Building Serv. Employees Int'l Union v. University of Minn. Employees' Local 450*, 271 Minn. 181, 135 N.W.2d 697, 700 (1965); *Liggett v. Koivunen*, 227 Minn. 114, 34 N.W.2d 345, 349 (1948); *Bryan v. International Alliance*, 43 Tenn. App. 180, 306 S.W.2d 64, 72 (1957). *See also* cases collected in 36 Am. Jur. 2d *Fraternal Orders and Benefit Societies* §§ 35, 36 (1968).

*e.g., Grand Aerie v. National Bank,* 13 Wn.2d 131, 138, 124 P.2d 203 (1942); *Hermione Lodge 16 v. Grand Lodge,* 248 Ala. 473, 28 So. 2d 166, 168 A.L.R. 948 (1946); *Schriner v. Sachs,* 253 Pa. 611, 98 A. 724, 725 (1916). Those laws still control. RCW 24.20.010(2), the statute under which O'Sullivan was incorporated, recognizes this fact by requiring a subordinate organization to state "the name of the grand body from which it derives its *rights and powers*".[3] (Italics ours.) *See also Grand Court v. Hodel,* 74 Wash. 314, 133 P. 438 (1913). O'Sullivan's articles of incorporation state:

> The name of the grand body from which this Grange derives its rights and powers as such Grange is The National Grange, Patrons of Husbandry.

The reasoning in *Grand Court,* at pages 316–17, is apropos here. There the court held a local lodge which had voted to secede from its order could not retain the property it had accumulated:

> The principal contention made by the appellants is that a subordinate lodge in an order, such as the one in consideration here, may secede from the parent organization, if the majority of such lodge wills it, and may take with them the money and property of the subordinate lodge. But such is not the rule. All of the properties which this branch of the order, as a fraternal and benevolent organization, had gathered together were trust funds in the sense that they were collected for particular uses. They were held in trust for the purposes designated by the constitution and laws of the order, and every member of the order has an interest in the fund to the extent of seeing that it is appropriated to the uses for which it was collected. No number of the members of the order less than the whole could, therefore, divert the funds to other uses than the uses defined in the constitution and laws of the order.

The court further addressed the impact of incorporation by

---

[3]We disagree with O'Sullivan's contention that RCW 24.20 was repealed by RCW 24.03, the Washington Nonprofit Corporation Act. That act repealed sections 2450–2454, Code of 1881, the precursor to RCW 24.08, the educational, religious, benevolent, fraternal or charitable societies act. RCW 24.20, the fraternal societies act, was enacted by Laws of 1903, ch. 80, which was not repealed.

the subordinate lodge at pages 317–18:

> [T]he rule with relation to its property would not be changed. Its funds would still be trust funds, subject to such disposition as the laws of the *order* permitted to be made of them, and could not be diverted to a use contrary to such laws without the unanimous consent of the members of the *order*.

(Italics ours.) Thus, O'Sullivan's incorporation did not confer powers upon it beyond those conferred by the Digest. Perforce, it could not amend its bylaws to change its contractual obligations with the National and State Granges. This court will not interfere with that contract absent compelling reasons. *See Lawson v. Hewell*, 118 Cal. 613, 50 P. 763, 765 (1897); *Bryan v. International Alliance*, 43 Tenn. App. 180, 306 S.W.2d 64, 72 (1957).

O'Sullivan and the Community Center essentially contend such a compelling reason exists here. Relying upon *Bellingham First Fed. Sav. & Loan Ass'n v. Garrison*, 87 Wn.2d 437, 553 P.2d 1090 (1976), they argue the consent provision in the Digest is a restraint on alienation and is void because there was no showing it is reasonable under the facts presented here. We disagree. *Bellingham* addressed a due–on–sale clause in a mortgage agreement permitting the lender–mortgagee to declare a default if the borrower–mortgagor sells the mortgaged property without the lender's consent. *See also Magney v. Lincoln Mut. Sav. Bank*, 34 Wn. App. 45, 659 P.2d 537, *review denied*, 99 Wn.2d 1023 (1983) (deed of trust).

■ Here, the interest of O'Sullivan members in real property owned by the grange is not comparable to that of the usual owner. Nor can the purpose of the Order of Patrons of Husbandry be compared to that of a lender. As members of a fraternal association, they have no severable rights in the property—merely the right to joint use so long as they remain members. *Lawson v. Hewell*, 50 P. at 765; *Liggett v. Koivunen*, 227 Minn. 114, 34 N.W.2d 345, 350 (1948); *Pennsylvania State Camp v. Washington Camp 135, supra; District Grand Lodge 25 v. Jones*, 138 Tex. 537,

160 S.W.2d 915 (1942).

The record shows the Order provides insurance at reduced rates and community service programs. It also lobbies for grange members in legislative matters. To accomplish these purposes, it accumulates a fund from contributions of members. *Cf. In re Philadelphia & Reading Coal & Iron Co. Fund,* 445 Pa. 65, 282 A.2d 688, 691 (1971) (beneficial association); F. Bacon, *Benefit Societies and Incidentally of Life Insurance* §§ 11, 12 (1888). It also preserves real property for future use by grange members. The master of the National Grange testified:

> This property was normally accumulated by Grange members over long periods of time . . . and the members do change as the years go by. Some pass on, some decline to continue membership, new members come into place. So it is for the benefit of all the Grange members that that property be retained properly for Grange use in the future.

To preserve the integrity of the Order for the benefit of existing and future members, sections 15 and 16 of the Digest impress property acquired by all granges with a trust. Those sections, in effect, provide the Order has a reversionary interest in the property when a subordinate grange ceases to exist. Provisions of this type have generally been held to be reasonable and not contrary to public policy. *Grand Lodge v. Osceola Lodge 18,* 178 N.W.2d 362 (Iowa 1970); *Grand Lodge v. Union Lodge 32,* 111 N.H. 241, 279 A.2d 590 (1971); *Pennsylvania State Camp v. Washington Camp 135,* 123 A.2d at 704; *District Grand Lodge 25 v. Jones,* 160 S.W.2d at 921; Annot., 94 A.L.R. 639, 646 (1935); Annot., 168 A.L.R. 956, 959 § III(a) (1947). We find the reasoning in *District Grand Lodge 25 v. Jones,* 138 Tex. at 547, persuasive:

> In the very nature of things the membership in [a] fraternal benefit organization is ever shifting and changing because of death, voluntary withdrawals, forfeiture from failure to pay dues, and the like. Local lodges come into being, not as independent organizations existing solely for the benefit of their members, but as constituents of

the larger organization, the grand lodge, organized for specific purposes, most of which can be accomplished only through subordinate bodies, the local lodges. They come into being to aid in the accomplishment of these purposes and then some of them pass away like their members before them. What is to become of their property? . . . The property so acquired by the local lodge becomes impressed with the group purpose of a fraternal benefit society. Upon demise of such lodge the way to keep it so impressed is certainly not by deeding it to the surviving members to enjoy according to their individual desires, but can be achieved only by giving it to the central state organization, the grand lodge, for disposition in accordance with its rules and the general law governing it.

The consent requirement of section 15 of the Digest ensures that the trust provision and reversionary interest of the state grange are not thwarted by a local grange transferring away its property before dissolving—the precise situation here. O'Sullivan members agreed to abide by its laws when they entered the Order. We do not deem it unreasonable to enforce this provision. *See Polish Falcons of Am. v. American Citizens Club*, 13 A.2d at 28.

Finally, O'Sullivan and the Community Center contend the court erred in issuing a permanent injunction preventing O'Sullivan from conveying its grange hall property in the future without first complying with section 15 of the Digest. It is argued there are no findings that O'Sullivan would in the future again convey the property without obtaining proper consent. With this contention we agree.

A party seeking an injunction must

establish (1) that he has a clear legal or equitable right, (2) that he has a well grounded fear of immediate invasion of that right by the one against whom the injunction is sought, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him. *Port of Seattle v. International Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 324 P.2d 1099 (1958); . . .

*Hendricks v. Lake*, 12 Wn. App. 15, 19, 528 P.2d 491 (1974); *see Tyler Pipe Indus., Inc. v. Department of*

*Rev.,* 96 Wn.2d 785, 792, 638 P.2d 1213 (1982); RCW 7.40.020.

*White v. Wilhelm,* 34 Wn. App. 763, 773, 665 P.2d 407 (1983).

It has been established that a clear right was invaded here—however, that right was rectified by the court order requiring that the Community Center return the grange property to O'Sullivan. There are no findings supporting a well grounded fear that O'Sullivan would, in the immediate future, *again* violate the laws of the Order by conveying the property without first obtaining consent. The absence of any findings on this issue constitutes findings against the party having the burden of proof—here, the National and State Granges and O'Sullivan's charter member. *See Omni Group, Inc. v. Seattle–First Nat'l Bank,* 32 Wn. App. 22, 28, 645 P.2d 727 (1982). Therefore, the injunction order is reversed.

Affirmed in part; reversed in part.

ROE, C.J., and McINTURFF, J., concur.